**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01213-NYW-KAS

TEJAS COUSIK,
TARIN ALLEN,
JAKE DOUGLAS,
ALEJO GONZALEZ,
JEREMY HEDLUND,
ROBERT HELMICK,
PHILLIP LOPEZ,
TYSON MCCORMICK,
BRIANNE SANCHEZ,
EMMA SMEDBERG,
JAMES WILLIAMS,
MARIAH WOOD, and
ABIGAIL ZINMAN,

      Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO,
CITY OF AURORA, COLORADO, and
JOSHUA WINTERS, AURORA POLICE OFFICER,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on the Aurora Defendants' Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") [Doc. 184]. Upon review of the Motion and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, the Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

This case arises from the protests that occurred in May and June 2020 after the murder of George Floyd.  Plaintiff Tyson McCormick ("Plaintiff" or "Mr. McCormick")[1] brings claims against the City of Aurora, Colorado ("Aurora" or "the City") and Aurora Police Officer Joshua Winters ("Officer Winters," and collectively with Aurora, "Defendants") for alleged violations of his constitutional rights during those protests.  *See generally* [Doc. 133].  Mr. McCormick asserts three claims under 42 U.S.C. § 1983 against the Aurora Defendants:  (1) a First Amendment retaliation claim; (2) a Fourth Amendment excessive force claim; and (3) a Fourteenth Amendment due process claim.  [*Id.* at ¶¶ 497–526].[2]

**LEGAL STANDARD**

Under Rule 56 of the Federal Rule of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

---

[1] For purposes of clarity, although there are other named Parties named in this action, the Court refers to Mr. McCormick singularly as "Plaintiff" and the Aurora Defendants collectively as "Defendants" for purposes of this Memorandum Opinion and Order.

[2] Plaintiff does not clearly delineate which claim is against which Defendant, and so the Court assumes that each claim is asserted against both Officer Winters and the City of Aurora.

Where the movant does not bear the ultimate burden of persuasion at trial, the movant does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views each motion "in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## UNDISPUTED MATERIAL FACTS

The facts of this case are largely disputed, and the Court focuses here on the limited facts on which the Parties agree.[3] On May 29, 2020, in response to the protests,

---

[3] Both sides attempt to dispute certain statements of fact presented by the other side, but only dispute a portion of the disputed fact. In this circumstance, the Court construes the non-objected-to portion of the statement undisputed for purposes of this Order without further note from the Court. *See* Fed. R. Civ. P. 56(e). Further, Mr. McCormick frequently "[o]bject[s]" to certain assertions of fact on the grounds that the assertions are immaterial, speculative, or hearsay. *See, e.g.*, [Doc. 201 at ¶¶ 3, 5–9]. It is well settled that a party need not produce evidence in a form that would be admissible at trial; instead, only the content or substance of the evidence must be admissible at trial. *See Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995); *see also* Fed. R. Civ. P. 56(c)(2) (a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). Mr. McCormick does not suggest in his Response that any evidence cited by Defendants cannot be presented in an admissible form at trial. *See generally* [Doc. 201]. Accordingly, the Court declines to consider Mr. McCormick's admissibility arguments. *See Troudt v. Oracle Corp.*, No. 16-cv-00175-

Denver requested aid from the Aurora Police Department ("APD")'s emergency response team.  [Doc. 184 at ¶ 1; Doc. 201 at 2, ¶ 1; Doc. 184-1 at 1].[4]  APD officers responded to Denver the morning of May 30, 2020.  [Doc. 184 at ¶ 6; Doc. 201 at 2; Doc. 184-1 at 1].

On May 31, 2020, protestors and law enforcement engaged at the intersection of Colfax and Washington.   [Doc. 184 at ¶ 12; Doc. 201 at 2]; *see, e.g.*, [Doc. 201-8 at 8:29:14–8:40:00].[5]  APD officers were deployed to the area to provide reinforcement. [Doc. 184 at ¶ 22; Doc. 201 at 2; Doc. 184-8 at 15].

Mr. McCormick arrived at the intersection of Colfax and Washington as a protest participant.  [Doc. 184 at ¶ 24; Doc. 201 at 5, ¶ 24; Doc. 184-11 at 14:3–14; Doc. 201-8

---

REB-SKC, 2019 WL 1006019, at *3 (D. Colo. Mar. 1, 2019) (declining to consider "undeveloped" hearsay objections at the summary-judgment stage).

[4] The Local Rules state that "[v]oluminous exhibits are discouraged" and instruct that parties "shall limit exhibits to essential portions of documents."  D.C.COLO.LCivR 56.1(c). Despite these directives, both sides submit voluminous exhibits—including lengthy videos and full deposition transcripts—even where the briefing relies only on a limited portion of the exhibit.  The Parties' failure to make prudent use of their exhibits, particularly where they have collectively submitted approximately 101 exhibits, has complicated the Court's ability to efficiently rule on this Motion.  Furthermore, the Local Rules also provide that "[u]nless otherwise ordered, copies of documents attached as exhibits to a motion shall not be attached as exhibits to a response, and copies of documents attached as exhibits to a response shall not be attached as exhibits to a reply."  *Id.*  In contravention of the Local Rules, Plaintiff has attached numerous duplicative exhibits to his Response.  *See, e.g.*, [Doc. 201-8; Doc. 201-9; Doc. 201-15; Doc. 201-17; Doc. 201-19].  The Parties are advised that any failure to comply with the Local Rules may result in this Court striking the filing without substantive consideration, and are further advised that the Parties will be expected to compile a more efficient presentation of exhibits at trial.

[5] For purposes of clarity, where Plaintiff has submitted duplicative copies of video exhibits submitted by Defendants, the Court cites to Plaintiff's submission due to Plaintiff's use of CM/ECF placeholders for conventionally submitted exhibits.  *See, e.g.*, [Doc. 201-8]. When citing to video evidence, the Court cites to the timestamp reflected on the video footage whenever possible.  When citing to transcripts, the Court cites to the page and line numbers appearing on the original transcript pages, but to the document number generated by the CM/ECF system.

at 8:31:51–8:32:04].[6]  At approximately 8:40 p.m., APD officers formed a skirmish line across the north crosswalk on Washington Street.  [Doc. 184 at ¶ 31; Doc. 201 at 6, ¶ 31; Doc. 201-19 at 20:40:00–20:41:40; Doc. 184-6 at 11].

At about 8:42 p.m., a gas canister was deployed into the south crosswalk at Colfax and Washington.  [Doc. 184 at ¶ 34; Doc. 201 at 6, ¶ 34; Doc. 191 (Exhibit R) at 20:42:23–20:42:35; Doc. 201-19 at 20:42:19–20:42:31].  Mr. McCormick walked to the gas canister, picked it up, and tossed it.  [Doc. 184 at ¶ 34; Doc. 201 at 6, ¶¶ 34, 36; Doc. 191 (Exhibit R) at 20:42:26–20:42:45; Doc. 201-19 at 20:42:26–20:42:39; Doc. 184-11 at 250:17–19].[7] The video then depicts Mr. McCormick "disappear[ing] into a cloud of gas, as several more gas canisters [were] deployed near the southeast corner of the intersection."  [Doc. 184 at ¶ 35; Doc. 201 at 2; Doc. 191 (Exhibit R) at 20:42:40–20:42:50].  Mr. McCormick claims that he was struck in the head at this time.  [Doc. 184 at ¶ 36; Doc. 201 at 6, ¶ 36; Doc. 133 at ¶ 369].  Mr. McCormick likely suffered a concussion and ear drum rupture and experienced nausea, hearing loss, headaches, and facial swelling.  [Doc. 201 at ¶ 11, 15; Doc. 211 at 2; Doc. 198-32 at 9; Doc. 198-29 at 117:5–17].

Officer Winters was part of the skirmish line at Colfax and Washington that night and was armed with a "less-lethal shotgun that shot beanbag rounds."  [Doc. 184 at ¶ 42; Doc. 201 at 2; Doc. 184-7 at 27:7–13].  Officer Winters "shot people who were tossing or touching gas canisters" on May 31, 2020, [Doc. 201 at 11, ¶ 14; Doc. 211 at 2; Doc. 201-

[6] The Parties agree that Mr. McCormick is identifiable in some video footage by "his all-black clothing . . ., small black backpack, white fabric rings at his wrists, and a white object protruding from his right rear pants pocket."  [Doc. 184 at ¶ 25; Doc. 201 at 2].

[7] The Parties dispute the appropriate characterization of Mr. McCormick's actions. Defendants claim that Mr. McCormick threw the gas canister "back toward the police officers on the skirmish line," [Doc. 184 at ¶ 34], while Plaintiff claims that he "tossed the canister away from the other protestors in the area," [Doc. 201 at 6, ¶ 36].

16 at 29:20–22], and APD officers had been instructed by a Sergeant Matthew Brukbacher to fire "less-lethal" shotgun rounds at protestors "touching gas canisters," [Doc. 201 at 10, ¶ 9, Doc. 211 at 2; Doc. 201-30 at 41:13–42:13].[8]

## ANALYSIS

Defendants seek summary judgment on each of Plaintiff's claims, arguing that (1) Plaintiff's First Amendment claim fails as a matter of law, [Doc. 184 at 12]; (2) Plaintiff's Fourth and Fourteenth Amendment claims against Officer Winters fail as a matter of law, [*id.* at 15]; (3) Officer Winters is entitled to qualified immunity, [*id.* at 16]; and (4) Plaintiff's claims against the City should be dismissed because Plaintiff cannot establish liability based on a municipal custom or policy, [*id.* at 17].   The Court addresses the Parties' arguments as to the merits of each claim, including Officer Winters's entitlement to qualified immunity, and then addresses the Parties' municipal liability arguments.

## I.    First Amendment Retaliation

"[A]ny form of official retaliation for exercising one's freedom of speech . . . constitutes an infringement of that freedom." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotation omitted).   To prevail on a First Amendment retaliation claim, a plaintiff must prove the following:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;  and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

---

[8] Plaintiff does not meaningfully identify Sergeant Brukbacher or describe his position within the APD beyond providing his rank.  *See* [Doc. 201 at 11, ¶ 14].

*Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).  Defendants argue that Mr. McCormick cannot satisfy the first or third elements of the claim.  [Doc. 184 at 12–14].

### A.    Protected Activity

With respect to the first element, Defendants contend that Mr. McCormick was not engaged in protected activity at the time he was struck but was instead "engaged in aggressive actions towards police officers by picking up a deploying gas canister and throwing it back at officers across Colfax."   [*Id.* at 12].   Defendants conclude that Mr. McCormick was "engaged in illegal conduct, which is not protected by the First Amendment," such that he cannot succeed on his First Amendment claim.  [*Id.*].  Plaintiff frames his conduct more broadly, asserting that he was inarguably engaged in protected activity when he "exercis[ed] his right to be present in a public place in solidarity with others protesting police brutality," which is protected speech.  [Doc. 201 at 14–15].  Mr. McCormick asserts that Defendants' characterization of his conduct "improperly views the evidence in the light most favorable to them."  [*Id.* at 15].

While protesting is undoubtedly protected activity, "not all forms of protest are protected."  *Epps v. City & Cnty. of Denver*, No. 20-cv-01878-RBJ, 2022 WL 21727363, at *3 (D. Colo. Sept. 23, 2022), *aff'd sub nom. Packard v. Budaj*, 86 F.4th 859 (10th Cir. 2023).   "[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."  *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972).

While the Court is not outright convinced by Plaintiff's suggestion that *all* of his conduct during the relevant time frame is protected by the First Amendment because it happened to occur during a protest, summary judgment is not appropriate on the present

record.  The Parties vehemently dispute the events of the protest, and in particular, Mr. McCormick's conduct with respect to the gas canister.  *See, e.g.*, [Doc. 184 at ¶¶ 28, 34; *id.* at 12–13; Doc. 201 at 5, ¶ 28; *id.* at 6, ¶¶ 34, 36–37].  Accepting Defendants' argument would require the Court to view the evidence in a light favorable to Defendants and draw inferences in Defendants' favor, which the Court cannot do.  *See Banner Bank*, 916 F.3d at 1326.  Accordingly, Defendants have not demonstrated that they are entitled to summary judgment on this basis.

## B.    Retaliatory Motive

In the alternative, Defendants argue that no reasonable jury could conclude that Officer Winters's alleged retaliatory motive was the but-for cause of his alleged actions. *See* [Doc. 184 at 13–14].  A successful First Amendment retaliation claim requires that the retaliatory animus be the "'but-for' cause" of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *see also Colonies Partners LP v. Cnty. of San Bernardino*, No. 5:18-cv-00420-JGB-SHK, 2020 WL 5102160, at *23 (C.D. Cal. July 28, 2020) (explaining that the retaliatory motive must be the but-for cause, not the protected activity), *aff'd sub nom. Erwin v. Ramos*, No. 20-55903, 2022 WL 541188 (9th Cir. Feb. 23, 2022).[9]

---

[9] The Court notes that Defendants contend that Mr. McCormick bears the burden of establishing but-for causation.  *See* [Doc. 184 at 13–14].  The authority cited by Defendants, however, is not specific to First Amendment retaliation claims arising from civil demonstrations.  It has long been established that, in public employment cases, once the plaintiff shows that the retaliatory animus was the substantial or motivating factor in an adverse action, the burden shifts to the defendant to prove that it would have taken the same action even absent the protected activity, i.e., the absence of but-for causation. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 309 (6th Cir. 2023).  Although this burden-shifting

According to Defendants, there is no evidence that Officer Winters was even aware of Plaintiff's presence, let alone evidence that Officer Winters perceived Mr. McCormick's conduct as First Amendment protected activity and shot at him for that reason.  [Doc. 184 at 13–14].  However, Defendants direct the Court to no legal authority suggesting that a defendant may only be liable for retaliation if the defendant correctly identifies and perceives a plaintiff's activity as protected activity.  *See* [*id.* at 14].  Plaintiff emphasizes that he was shot during a protest without warning and suggests that this gives rise to an inference that Officer Winters acted with a retaliatory motive.  [Doc. 201 at 15].  He also directs the Court to evidence that Officer Winters "continued to shoot into the intersection at protestors who attempted to help" him.  [*Id.* at 16]; *see also* [Doc. 201-17 at 20:43:00–20:43:25; Doc. 201-16 at 110:3–5 ("Q. You fire two more times, right, at about 3 minutes

---

approach is most commonly used in the public employment context, the Supreme Court has described this approach as appropriate in "ordinary" retaliation cases.  *See Hartman v. Moore*, 547 U.S. 250, 260 (2006); *see also Nieves*, 139 S. Ct. at 1736 (Sotomayor, J., dissenting) ("The standard framework for distinguishing legitimate exercises of governmental authority from those intended to chill protected speech is well established." (citing *Mt. Healthy*, 429 U.S. at 287)).  In addition, the Courts of Appeals for the Ninth and Eleventh Circuits both include this burden-shifting framework in their respective pattern jury instructions for First Amendment retaliation claims.

The Supreme Court has recognized two exceptions to this approach:  retaliatory prosecution cases and retaliatory arrest cases.  To succeed on these types of First Amendment claims, the plaintiff must also make a threshold showing that there was no probable cause supporting the prosecution or arrest.  *See Hartman*, 547 U.S. at 260–61; *Nieves*, 139 S. Ct. at 1725.  But if the plaintiff makes that threshold showing, "then the *Mt. Healthy* test governs:  The plaintiff must show that the retaliation was a substantial or motivating factor behind the [adverse action], and, if that showing is made, the defendant can prevail only by showing that the [adverse action] would have been initiated without respect to retaliation."  *Nieves*, 139 S. Ct. at 1725 (quotation omitted).  Thus, it appears that the *Mt. Healthy* framework applies not just in the public employment context, but to all First Amendment retaliation cases.  *See Colonies Partners LP*, 2020 WL 5102160, at *23 (discussing the burden-shifting framework).  Because the Parties do not brief this issue on this authority, the Court does not definitively rule on this issue, but puts the Parties on notice of this outstanding issue that must be resolved prior to trial.

and 18 seconds?  A. Yes."); *id.* at 111:7–9 ("Q. You fire two more times at 3 minutes and 24 seconds, correct?  A. Yes.")].

"Motivation is a question of fact," *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 463 (10th Cir. 2013), and "[b]ecause the ultimate fact of retaliation is about defendants' state of mind, it is particularly difficult to establish by direct evidence" and may be shown through circumstantial evidence, *Merritt v. Hawk*, 153 F. Supp. 2d 1216, 1224 (D. Colo. 2001).   While Defendants claim there is no evidence that Officer Winters knew of Mr. McCormick's presence on the street, video evidence from multiple officers' body worn cameras ("BWC") appears to show Mr. McCormick walking in the middle of an intersection during the protests.  *See, e.g.*, [Doc. 201-19 at 20:42:20–20:42:42; Doc. 201-15 at 20:42:22–20:42:45].  Furthermore, a reasonable jury could draw an inference of a retaliatory motive if Officer Winters did, as Plaintiff claims, continue to shoot at protestors who were helping Mr. McCormick after he was injured, as this may suggest a retaliatory animus against protestors in general.   And other courts have concluded that a retaliatory motive may be inferred from the fact that a protestor was protesting against police brutality.   *See Jones v. City of Los Angeles*, No. 2:20-cv-11147-FWS-SK, 2023 WL 2558789, at *14 (C.D. Cal. Jan. 24, 2023) (finding genuine issue of material fact as to motive where a reasonable jury could "reasonably infer that evidence including [d]efendant's numerous firings of his less-lethal launcher, aiming at protestors, and violations of LAPD policy regarding less-lethal launchers, show he fired in [p]laintiff's direction because he disagreed with [p]laintiff and the other protestors' criticism of police practices"); *Llera v. Las Vegas Metro. Police Dep't*, No. 2:20-cv-01589-RFB-BNW, 2023 WL 6393092, at *6 (D. Nev. Sept. 30, 2023) ("Defendant Squeo's retaliatory conduct

occurred during the protest.  This short 'proximity in time between' between Decedent's conduct and Defendant[] Squeo's retaliatory conduct supports an inference that Defendant Squeo retaliated against Decedent in violation of his First Amendment rights." (quotation omitted)).  This evidence together is sufficient circumstantial evidence to create a genuine dispute of fact as to whether Mr. McCormick's alleged protected activity was the but-for cause of Officer Winters's actions.  Summary judgment is not appropriate on this basis.

### C.     Qualified Immunity

Finally, Defendants contend that Officer Winters is entitled to qualified immunity against the First Amendment claim.  [Doc. 184 at 16–17].  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "When a defendant asserts a qualified immunity defense, the plaintiff must meet a strict two-part test.  The plaintiff must establish (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct."  *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation and quotation omitted).  The plaintiff bears the burden to overcome the defendant's assertion of qualified immunity.  *See Hunt v. Montano*, 39 F.4th 1270, 1284 (10th Cir. 2022) ("When a § 1983 defendant raises qualified immunity, . . . the burden shifts to the plaintiff.").

A right is clearly established if there is a Supreme Court or Tenth Circuit decision on point or if the weight of authority in other courts provides that the right is clearly

established.  *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017); *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001).  A case is considered "on point" if it involves materially similar conduct to the case at hand or applies "with obvious clarity" to the conduct at issue.  *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (quotation and emphasis omitted).  Although a case *directly* on point is not required, *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018), the Court must be mindful "not to define clearly established law at too high a level of generality," *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021).  "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* (quotation omitted).

Addressing qualified immunity at the summary judgment stage requires the Court to adopt the plaintiff's version of the facts that are supported with evidence and ask whether that version of the facts is sufficient to overcome the invocation of qualified immunity.  *Helvie v. Jenkins*, 66 F.4th 1227, 1232 (10th Cir. 2023); *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021).  But the Court does not accept the plaintiff's version of the facts if there is clear video evidence that is contrary to the plaintiff's version of events.  *Est. of Taylor*, 16 F.4th at 757.

Defendants contend that Officer Winters is entitled to qualified immunity because "there is no authority establishing that officers violate the constitution simply by deploying less-lethal munitions against individuals interfering with gas canisters during a chaotic and dangerous mass demonstration/crowd-control scenario."  [Doc. 184 at 16–17].  Plaintiff disagrees with this assertion, but fails to distinguish between or make specific

arguments about his separate claims; he instead asserts generally that "it was clearly established as of May 2020 that firing 'less-lethal' munitions at a non-threatening protestor is unlawful."   [Doc. 201 at 17].   In support, Plaintiff directs the Court to one First Amendment case—*Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008).  *Buck*'s First Amendment analysis is brief, but in that case, the Tenth Circuit stated that "[i]t has long been clearly established that the First Amendment bars retaliation for protected speech and association."  549 F.3d at 1292 (alteration in original) (quoting *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005)).  In their Reply, Defendants argue that *Buck* is too factually dissimilar to demonstrate clearly established law.  [Doc. 211 at 8–9].

The Court respectfully disagrees with Defendants and finds their construction of the operative question too narrow.  The issue here is not whether Officer Winters was on notice that it would be a constitutional violation to "deploy less-lethal munitions against individuals interfering with gas canisters during a chaotic and dangerous mass demonstration/crowd-control scenario," *see* [Doc. 184 at 16–17], but whether a reasonable officer would be on notice that the conduct alleged in Plaintiff's version of the facts—shooting at a peaceful protestor in retaliation because of that protestor's exercise of his First Amendment rights—would be unlawful, *City of Tahlequah*, 595 U.S. at 12; *Helvie*, 66 F.4th at 1232.

Any "form of official retaliation for exercising one's freedom of speech . . . constitutes an infringement of that freedom."   *Worrell*, 219 F.3d at 1212.  It is well established that protests, subject to reasonable time, place, and manner restrictions, are protected by the First Amendment.  *See, e.g.*, *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir.

2006) ("The Supreme Court has declared that the First Amendment protects political demonstrations and protests—activities at the heart of what the Bill of Rights was designed to safeguard." (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988))); *Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1148 (10th Cir. 2020) (explaining that public spaces such as streets "are places that 'by long tradition or by government fiat have been devoted to assembly and debate'" (quoting *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45 (1983))); *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982) ("[S]peech to protest racial discrimination is essential political speech lying at the core of the First Amendment." (quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979))).  The Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder."  *Jones*, 465 F.3d at 56 (citing *Cox v. Louisiana*, 379 U.S. 536, 550 (1965)).

Accepting Plaintiff's version of the events, Officer Winters retaliated against Mr. McCormick while Mr. McCormick was peacefully protesting because Mr. McCormick was engaging in protected speech.  In other words, Officer Winters engaged in conduct that has long been established as unlawful, in retaliation for Plaintiff's participation in activity that has long been established as protected under the First Amendment.  "[Q]ualified immunity does not protect an officer where the constitutional violation was so obvious under general well-established constitutional principles that any reasonable officer would have known the conduct was unconstitutional," *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023), and a number of district courts have denied qualified immunity in similar First Amendment circumstances, *see Buck v. City of Albuquerque*, No. 1:04-cv-

01000-WJ-DJS, 2007 WL 9734037, at *42 (D.N.M. Apr. 11, 2007) ("A reasonable officer would have understood that using force against law-abiding demonstrators for the purpose of interfering with their First Amendment rights was contrary to the established law."), *aff'd*, 291 F. App'x 122 (10th Cir. 2008), *and aff'd in part, appeal dismissed in part*, 549 F.3d 1269; *see also Irizarry v. City & Cnty. of Denver*, 661 F. Supp. 3d 1073, 1091 (D. Colo. 2023) ("The law was also clearly established in June 2019 that 'the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech[.]'" (quoting *Nieves*, 139 S. Ct. at 1722, 1725)); *Douglass v. Garden City Cmty. Coll.*, 652 F. Supp. 3d 1329, 1345 (D. Kan. 2023) (denying qualified immunity because "[i]n the Tenth Circuit, the law has been clearly established since at least 2000 that Section 1983 prohibits retaliation for exercising constitutionally protected rights under the First Amendment").  The Court finds that Officer Winters is not entitled to qualified immunity on this claim.  Accordingly, the Motion for Summary Judgment is **DENIED** to the extent it seeks judgment in Officer Winters's favor on Plaintiff's First Amendment claim.

## II.      Fourteenth Amendment Due Process

Defendants next assert that Plaintiff's Fourteenth Amendment claim fails as a matter of law.  [Doc. 184 at 15].  As a preliminary matter, Defendants contend that "excessive force claims are properly brought under the Fourth, not the Fourteenth, Amendment."  [*Id.*].  The Court disagrees with this blanket conclusion.  "Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment . . . and each carries with it a very different legal test."  *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010).  Determining what constitutional amendment applies depends on what

stage of the criminal justice system the plaintiff is in. *Est. of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014).  For example, the Eighth Amendment applies to claims of excessive force raised by convicted prisoners; the Fourth Amendment applies to claims asserted by arrestees; and the Fourteenth Amendment applies to pretrial detainees' excessive force claims. *Id.*; *see also Porro*, 624 F.3d at 1325; *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019).  But if the plaintiff has not entered the criminal justice system and there has been no seizure at all, the Fourteenth Amendment governs excessive force claims. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003); *Roybal-Mack v. N.M. Dep't of Pub. Safety*, 286 F. Supp. 3d 1226, 1234–36 (D.N.M. 2017); *Mahdi v. Salt Lake Police Dep't*, 54 F.4th 1232, 1236 (10th Cir. 2022).  Defendants do not explain why Plaintiff cannot assert an alternative Fourteenth Amendment claim, *see* [Doc. 184 at 15], and so their argument that Plaintiff's claim is asserted under the wrong constitutional provision is without merit, *see* Fed. R. Civ. P. 8(d)(2); *Gramercy Distressed Opportunity Fund II L.P. v. Piazza*, No. 22-8050, 2023 WL 6296948, at *2 (10th Cir. May 10, 2023) (observing that the Federal Rules of Civil Procedure do not preclude pleading in the alternative, "[b]ut even when a party pleads in the alternative, there may come a point at which a choice must be made").

Defendants also contend that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim because (1) there is no evidence that any Aurora officer participated in the conduct on which this claim is based; and (2) there is "no evidence supporting any application of the Fourteenth Amendment's exacting 'conscience shocking' standard, where 'not even "[i]ntentionally or recklessly causing injury through the abuse or misuse of government power is enough"' to demonstrate liability."  [Doc. 184

at 15 (quoting *Mann v. Hyler*, 918 F.3d 1109, 1116 (10th Cir. 2019))].  In his Response, Mr. McCormick argues—in a footnote—only that "[a] jury can conclude Defendants' behavior—shooting a protestor engaged in protected activity in a matter that caused serious head injuries—shocks the conscience and constitutes a clear abuse of government authority."  [Doc. 201 at 14 n.7].

"An excessive force claim under the Fourteenth Amendment targets arbitrary governmental action, taken without due process."  *Est. of Booker*, 745 F.3d at 423 (quotation omitted).  To succeed on such a claim, the plaintiff must demonstrate that the challenged conduct "shocks the conscience."  *Mahdi*, 54 F.4th at 1236 (quoting *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019)).  The Tenth Circuit has instructed that there are "two different standards to apply the shocks-the-conscience test," the application of which depends on "whether the state actor had time to deliberate before engaging in the complained-of conduct."  *Id.*  If the actor had time to deliberate—i.e., had "time for unhurried judgments and repeated reflection" and the "opportunity for attention," with "no substantial pulls of competing obligations," conduct will shock the conscience if it is deliberately indifferent to a person's life or security.  *Id.* at 1236–37 (quotation omitted).  But if there was no opportunity to deliberate, the plaintiff must show that the conduct was "done with the intent to harm the injured party."  *Id.*  "Stated differently, 'when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness' is not conscience-shocking."  *Shaw v. City of Norman*, No. 22-6106, 2023 WL 2923962, at *2 (10th Cir. Apr. 13, 2023) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)).

Mr. McCormick's limited argument is insufficient to survive summary judgment on his Fourteenth Amendment claim.  It is well settled that arguments raised in a perfunctory manner, such as in a footnote, are waived.  *United States v. Walker*, 918 F.3d 1134, 1153 (10th Cir. 2019).   It is Plaintiff's burden to prove conscience-shocking conduct.  *See Radecki v. Barela*, 146 F.3d 1227, 1229 (10th Cir. 1998); *Hall v. Ramsey Cnty.*, 801 F.3d 912, 918 (8th Cir. 2015).   Because Defendants do not bear the ultimate burden of persuasion at trial, Defendants need not negate Plaintiff's Fourteenth Amendment claim; rather, Defendants simply must "point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler*, 144 F.3d at 671. The burden then shifts to Plaintiff "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Id.* (quotation omitted).   Furthermore, before deciding whether Plaintiff has put forth sufficient evidence to survive summary judgment, the Court must make a threshold determination as to what legal standard applies to Plaintiff's claim. *See Perez v. Unified Gov't of Wyandotte Cnty.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005).

But Mr. McCormick does not make any argument explaining his position as to whether the deliberate-indifference standard or the intent-to-harm standard applies or cite any record evidence supporting any particular theory.  *See generally* [Doc. 201].   Nor does Plaintiff explain why either of the two cases he cites support denial of the Motion for Summary Judgment, which is, by nature, a fact-specific inquiry.  [*Id.* at 14 n.7].   It is not this Court's role to craft arguments on behalf of parties or search the exceedingly voluminous case record for evidence in support of multiple potential theories of relief.

*Lebahn v. Owens*, 813 F.3d 1300, 1308 (10th Cir. 2016); *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022).

Because Plaintiff does not address the appropriate legal standard or direct the Court to evidence related to that standard, the Court finds that summary judgment in Defendants' favor on the Fourteenth Amendment claims is appropriate. *Cf. Shaw*, 2023 WL 2923962, at *4 (affirming denial of due process claim where the plaintiffs made "no attempt to satisfy" the applicable intent-to-harm standard); *OneSource Com. Prop. Servs., Inc. v. City & Cnty. of Denver*, 535 F. App'x 740, 748 (10th Cir. 2013) (affirming grant of summary judgment in the defendant's favor where the plaintiffs inadequately briefed their claims and failed to establish genuine issues of material fact); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 41 (10th Cir. 2013) (declining to consider arguments that fail to address the correct legal standard).  Indeed, while this Court may draw reasonable inferences, "such inferences must find support in definite, competent evidence cited by the parties and made part of the record at time of completion of briefing on the motion for summary judgment."  *Stephens v. GEICO Indem. Co.*, No. 1:04-cv-01168-MCA-RHS, 2006 WL 8444161, at *3 (D.N.M. May 15, 2006) (citing *Anderson*, 477 U.S. at 256–67, and *Adler*, 144 F.3d at 670–71).  "The Court cannot manufacture grounds for denying a motion for summary judgment by piling inference upon inference without 'solid, fact-specific footings.'"  *Id.* (quoting *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1516 (1st Cir. 1989)).

As a result, the Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's Fourteenth Amendment due process claim.

III.    **Fourth Amendment Excessive Force**

Claims alleging that a police officer used excessive force in the seizure of a free citizen are properly asserted under the Fourth Amendment, *Graham v. Connor*, 490 U.S. 386, 395 (1989), which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," U.S. Const. amend. IV.  To succeed on a Fourth Amendment excessive force claim, a plaintiff must prove that they were seized and that the seizure was unreasonable.  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989); *see also Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015) ("Without a seizure, there can be no violation of the Fourth Amendment.").

Defendants contend that Mr. McCormick cannot succeed on the merits of his Fourth Amendment claim against Officer Winters for two reasons:  first, there is no evidence in the record showing that Officer Winters engaged in excessive force,[10] and second, even if there were such record evidence, "unintentional or accidental application of force is insufficient to demonstrate a Fourth Amendment seizure."  [Doc. 184 at 15–16].  In the alternative, Defendants contend that Officer Winters is entitled to qualified immunity on the claim.  [*Id.* at 16–17].

---

[10] The Court construes this as an argument that there is no evidence that it was Officer Winters who shot Plaintiff, rather than an argument that there is no evidence of excessive force.  Indeed, Officer Winters does not argue that any use of force against Mr. McCormick was reasonable under the factors set forth in *Graham*, 490 U.S. 386, and focuses instead on what he believes is a lack of evidence showing that a projectile from Officer Winters's weapon struck Plaintiff, [Doc. 184 at 15–16].

**A.    Evidence of Excessive Force**

Because Defendants argue that Mr. McCormick lacks evidence supporting an essential element of his Fourth Amendment claim, the burden shifted to Mr. McCormick to adduce sufficient evidence establishing a genuine issue for trial.  *Anderson*, 477 U.S. at 250.   Plaintiff directs the Court to evidence that (1) Officer Winters stated in his deposition that he shot at protestors touching gas canisters, like Mr. McCormick was; (2) Officer Winters stated that he targeted his shots intentionally and was trained to do so; and (3) when Mr. McCormick touched the gas canister, Officer Winters purportedly shouted "Hey, what's that guy doing?" and fired at Mr. McCormick.  *See* [Doc. 201 at 13].

Defendants respond that this evidence is insufficient to preclude summary judgment because there is no evidence demonstrating to whom Officer Winters was referring when he discharged his weapon, and his weapon was "aimed further east down Colfax from Plaintiff's position at the time" Officer Winters fired.   [Doc. 211 at 3–4]. Defendants also contend that there were other Aurora and Jefferson County officers with beanbag rounds in the area, and any of those officers could have struck Plaintiff.   [*Id.* at 4].  Defendants assert that Plaintiff "cannot escape the admonition of *Scott* [*v. Harris*, 550 U.S. 372 (2007)] with respect to what the video evidence in this case clearly shows."  [*Id.*]. In *Scott v. Harris*, the Supreme Court instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  550 U.S. at 380.

The Court has reviewed all of the evidence referenced by the Parties and observes as follows.  Plaintiff's retained physician expert opines that Mr. McCormick's injuries were

consistent with being shot by a "bean bag round," also described as a "flexible baton round."  [Doc. 198-23 at 6, 9].  During the protests, Officer Winters used a "bean bag shotgun."  [Doc. 201-16 at 27:7–10].  Before Mr. McCormick was shot, he approached a tear gas canister and, in Plaintiff's view, tossed the canister away from other protestors. [Doc. 201-14 at 4].  Officer Winters was asked at his deposition whether he "[shot] any people who were tossing or touching tear gas canisters" and answered affirmatively. [Doc. 201-16 at 29:20–22]; *see also* [*id.* at 44:13–18].  Officer Winters's BWC footage appears to show that while patrolling on May 31, 2020, at approximately 8:43 P.M., he said "what's that guy doing?" before raising his arms and deploying his weapon.  *See* [Doc. 201-17 at 20:43:00–20:43:10].  Mr. McCormick states he was shot at approximately 8:42–43 P.M. on May 31, 2020.  [Doc. 201-14 at 4].  A number of other BWC videos submitted by Plaintiff appear to depict the events from different vantage points, as certain protestors can be heard saying the same phrases across all BWC videos; however, given the amount of obstruction in the BWC videos, Plaintiff has not directed the Court to any video that *clearly* shows that it was Officer Winters's shot that injured Plaintiff.  *See, e.g.*, [Doc. 201-15 at 20:42:28–20:42:44; Doc. 201-18 at 20:42:32–20:42:43; Doc. 201-19 at 20:42:32–20:42:48].

Defendants insist that Mr. McCormick's version of events is blatantly contradicted by clear video evidence because Officer Winters's weapon was "aimed farther east down Colfax from Plaintiff's position at the time [Officer Winters] fires."  [Doc. 211 at 4].  In support, Defendants rely on Officer Winters's BWC footage.  *See* [*id.* (citing Doc. 184 at ¶ 45)].  However, the Court has reviewed this footage and cannot conclude that the video, which is largely obstructed by Officer Winters's hands or arms, *see* [Doc. 201-17 at

20:42:04–20:42:06], "blatantly contradict[s]" Mr. McCormick's assertion that he was shot

by Officer Winters, *Scott*, 550 U.S. at 380.

Defendants also cite Officer Winters's deposition testimony in support of their

argument that Plaintiff's version of events is blatantly contradicted by the record.  *See*

[Doc. 211 at 4; Doc. 184 at ¶ 45 (citing Doc. 184-7 at 106:19–110:24)].  The exchange

Defendants rely upon is as follows:

Q.  Okay.  If you're standing at the intersection and your camera is pointing towards the southwest, your gun is pointing more towards the crosswalk across the street, right?

A.  I can't tell from my video that that's where I'm pointing.

Q.  Okay.  Well, your camera is not pointing east or – I'm sorry.  Your gun is not pointing east or north, right?

A.  So, I mean, you can see Washington Street, too . . . on my camera.  You, obviously, can see the streetlight and the sign.  My camera is showing part of that lane in that intersection.  I would think if it was pointed directly down the middle, you would be able to see more of my gun and barrel pointed in that direction.  This looks farther off to the east.

Q.  To the east?

A.  But you can't -- Yes.

Q.  You think your gun is pointed to the east --

A.  I'm just --

Q.  -- down Washington?

A.  The east down Colfax [sic].  I'm saying you can see Washington Street right there.  You can see the corner of --

 Q.  I'm sorry.  That's -- This direction is to the west.  Let's just -- This -- This camera view is at the southwest corner, right?  Where the camera is facing, right, is the southwest corner?

A.  Yes.

Q.  Okay.  So that means to the right-hand side of the camera view is to the west?

A.  Yes.

Q.  Okay.  And to the left-hand side of the camera view is to the south?

A.  No.

Q.  Or to the east?

A.  To the east, yes.

Q.  Well, south comes between east and west --

A.  Okay.

Q.  -- right?

A.  Okay. I see what you're --

Q.  I mean, if we're just going around in a circle, right?  I mean, is that right?

A.  Yes.

Q.  Okay. So your gun -- Your camera's pointed to the southwest, but your gun is pointed more towards the south or the east?

A.  I would say that's a pretty good depiction.

[Doc. 184-7 at 106:19–108:24].  Setting aside the fact that this exchange is less than clear, it would be improper for the Court to adopt a moving party's own interpretation of video evidence, or the moving party's *attorney's* own interpretation of video evidence, in deciding whether a party's position is blatantly contradicted by the record.  *Banner Bank*, 916 F.3d at 1326.  And finally, Officer Winters's argument that there were several other officers at the scene who could have shot Mr. McCormick does nothing more than identify a factual dispute for the jury to resolve.

The Court finds that Officer Winters has not demonstrated the applicability of *Scott* to this case and concludes that Mr. McCormick has adduced sufficient evidence from which a reasonable jury could find that it was Officer Winters who shot Mr. McCormick.

### B.   Unintentional or Accidental Force

In the alternative, Defendants contend that "unintentional or accidental application of force is insufficient to demonstrate a Fourth Amendment seizure" and that there is a "total lack" of evidence demonstrating that Officer Winters intentionally applied force to Mr. McCormick.  [Doc. 184 at 16].  The Court respectfully disagrees that there is a lack of evidence of intentional conduct.   Aside from the evidence discussed just above concerning the timing of Mr. McCormick's tossing of the gas canister; Officer Winters's statement asking "what's that guy doing?" and then his immediate deployment of his weapon; and Officer Winters's statement that he shot at protestors touching gas canisters, Mr. McCormick has also directed the Court to evidence that Officer Winters was trained on the deployment of less-lethal munitions, [Doc. 201-16 at 20:23–21:21, 22:3–25]; that if his target is within 60 feet, he can aim his weapon accurately, [*id.* at 25:9–12]; and that his training by the Aurora Police Department "included allowing [him] to shoot at people who were interfering with . . . gas canisters," [*id.* at 48:22–49:9].  While Officer Winters maintains that he did not shoot Mr. McCormick and that he did not target any protestor's head in his deployments, *see* [*id.* at 29:15–19], his personal position about what happened is insufficient to secure summary judgment.   Construing the record evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find that Officer Winters intentionally applied force to Mr. McCormick.

### C.     Qualified Immunity

Finally, Defendants contend that Officer Winters is entitled to qualified immunity from Mr. McCormick's Fourth Amendment claim because any alleged constitutional violation was not clearly established at the time of the violation.  [Doc. 184 at 16].  They assert that there is no clearly established law "holding that use of less-lethal munitions against individuals interfering with gas canisters and throwing those canisters back at law enforcement violates the Constitution."  [*Id.* at 17].  Plaintiff responds that it was clearly established as of May 2020 that "firing 'less-lethal' munitions at a non-threatening protestor is unlawful," relying on *Fogarty v. Gallegos*, 523 F.3d 1147, and *Buck*, 549 F.3d at 1269.  [Doc. 201 at 17–18].  The Court is again mindful that clearly established law requires a level of clarity so as to make it "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *City of Tahlequah*, 595 U.S. at 12. This is especially important in Fourth Amendment cases, where it may be "difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Packard*, 86 F.4th at 868 (quotation omitted).

The Court first discusses the cases cited by Plaintiff.  In *Fogarty*, the plaintiff alleged that during a protest, while he was kneeling on the steps of a campus bookstore, he was shot with "some sort of projectile, perhaps a 'pepper ball' or some other variety of 'less lethal munition.'"  523 F.3d at 1152, 1160.  The Tenth Circuit affirmed the district court's denial of qualified immunity to the defendants.  Viewing the evidence in the light most favorable to the plaintiff, the Tenth Circuit concluded that the officers' use of force was unreasonable because the plaintiff was engaged in, at most, a misdemeanor offense, there was "no suggestion" that the plaintiff "posed an immediate threat to the safety of the

officers or others," and the plaintiff was "neither actively resisting arrest nor attempting to evade arrest by flight." *Id.* at 1160. Furthermore, the *Fogarty* court found that it would be apparent to a reasonable officer in the defendants' position would have been on notice of the unlawfulness of their actions. *Id.* at 1161–62.

Similarly, in *Buck*, the plaintiff alleged that she was "subjected to tear gas and then shot repeatedly with pepper ball rounds" while protesting by sitting in the street, and was "repeatedly shot with pepper ball rounds" even after "lying down to show that she was not a threat." 549 F.3d at 1289. The Tenth Circuit observed that the severity of the plaintiff's alleged infractions and the potential threat she posed to officers "appeared to be nil" because she was lying on the ground and was not resisting or evading arrest. *Id.* The Tenth Circuit concluded that the plaintiff had sufficiently alleged unconstitutional excessive force, *id.*, and further held that, at the time of the alleged violation, the law was clearly established, *id.* at 1291.

The Tenth Circuit recently discussed the force of *Fogarty* and *Buck* in a case with allegations similar to those asserted here. In *Packard v. Budaj*, two plaintiffs alleged that they were hit with bean bag rounds during the 2020 protests. 86 F.4th at 862. One of the plaintiffs was hit immediately after he kicked a tear gas canister "away from himself and other protesters, in the direction of a line of officers." *Id.* Relying on *Buck* and *Fogarty*, the district court denied summary judgment to the defendant officers on the basis that the law was clearly established that "an officer cannot shoot a protester with pepper balls or other less-lethal munitions when that protester is committing no crime more serious than a misdemeanor, not threatening anyone, and not attempting to flee." *Epps*, 2022 WL 21727363, at *7. In so doing, the district court concluded, based on the

evidence before it, that a reasonable officer would not have viewed the kicking of the gas canister as an imminent threat. *Id.* The Tenth Circuit agreed with the district court and affirmed the denial of qualified immunity. *See Packard*, 86 F.4th at 869. More specifically, the Tenth Circuit held that even though neither *Fogarty* nor *Buck* were identical to the facts presented in *Packard*, those cases nevertheless gave "notice that the use of less-lethal munitions—'as with any other type of pain-inflicting compliance technique'—is unconstitutionally excessive force when applied to an unthreatening protester who has neither committed a serious offense nor attempted to flee." *Id.* (quoting *Fogarty*, 523 F.3d at 1161). The Tenth Circuit declined to revisit the trial court's conclusions as to whether the plaintiffs' actions were reasonably threatening to officers. *Id.* In sum, "[b]y May of 2020, . . . it had been clearly established for (at least) twelve years that the deployment of less-lethal munitions on an unthreatening protester who is neither committing a serious offense nor seeking to flee is unconstitutionally excessive force." *Id.* at 870.

With this guidance in mind, the Court turns to the facts of this case, accepting Plaintiff's version of the facts that are supported by the evidence. *Helvie*, 66 F.4th at 1232. Mr. McCormick claims that right before he was shot, he tossed the gas canister away from himself and other protestors, not at the police officers. [Doc. 201 at 17; *id.* at 6, ¶ 37 ("McCormick did not throw the canister back at the police. He walked into the intersection and tossed it away from other protestors")]; *see also* [Doc. 201-14 at 4 ("Before Plaintiff was shot, he had approached a tear gas canister that had been thrown into the intersection by an officer in the skirmish line. . . . Plaintiff tossed the canister away from the other protestors in the area who were trying to get through the intersection and stay at a safe distance from the officers. The canister landed several feet away and

did not hit anyone.")].  Plaintiff claims that the video evidence shows that the canister "went nowhere near Winters" before Officer Winters allegedly shot Mr. McCormick.  [Doc. 201 at 17].  The Court observes from the video evidence, though oftentimes unclear and obstructed, that a person identified by the Parties as Mr. McCormick appears to walk toward a deployed and expelling gas canister and throw or toss the gas canister into the middle of the intersection, after which the gas canister continues to roll and produce gas. [Doc. 201-19 at 20:42:20–20:42:42 (Mr. McCormick appearing from the lefthand bottom corner of the video); Doc. 201-15 at 20:42:22–20:42:45 (Mr. McCormick and the toss appearing on the right half of the video); Doc. 201-18 at 20:42:20–20:42:41 (showing the gas canister's movement after it was tossed by Mr. McCormick); Doc. 201-20 at 20:42:57–20:43:10 (same)].  Defendants do not direct the Court to any "clear contrary" video evidence that negates Plaintiff's position that the gas canister was not directed at the police.  *See generally* [Doc. 184; Doc. 211].[11]  And neither Party states a clear position with respect to how close the gas canister came to Officer Winters or other police officers. Although Defendants insist that this is a case where Officer Winters used less-lethal munitions against a person "interfering with gas canisters and throwing those canisters back at law enforcement," [Doc. 184 at 17], accepting Defendants' version of events and articulation of the constitutional right at stake would require the Court to construe the evidence and inferences in Defendants' favor, which this Court cannot do, *Banner Bank*, 916 F.3d at 1326.

---

[11] While Defendants argue that Plaintiff threw the canister at law enforcement, *see* [Doc. 184 at 17], the Court must accept Plaintiff's supported version of events at this juncture.

The Court also notes that Officer Winters stated at his deposition that at the time of the incident he was wearing a gas mask, a padded vest, a helmet, and a face shield, and that the gas mask protected him "[f]rom any kind of chemical, smoke, things of that nature." [Doc. 201-16 at 56:12–20]; *see also* Fed. R. Civ. P. 56(c)(3) (courts may consider record evidence not cited by the parties in their summary judgment briefing). Like in *Epps*, this use of significant protective gear may support Plaintiff's position that he did not pose a threat to officers. *See Epps*, 2022 WL 21727363, at *7 (finding that the kicking of a gas canister "roughly in the direction of" police officer "did not pose an immediate threat" because the "officers were equipped with gas masks that protected them from any gas from that canister").

"By May of 2020, . . . it had been clearly established for (at least) twelve years that the deployment of less-lethal munitions on an unthreatening protester who is neither committing a serious offense nor seeking to flee is unconstitutionally excessive force." *Packard*, 86 F. 4th at 870. Accepting Plaintiff's version of events, a reasonable jury could conclude that Mr. McCormick did not pose a threat to officers, had not committed a serious offense, and was not attempting to flee or resist arrest. Accordingly, Officer Winters is not entitled to qualified immunity against Plaintiff's Fourth Amendment claim. The Motion for Summary Judgment is **DENIED** to the extent it seeks judgment on Plaintiff's Fourth Amendment claim against Officer Winters.

## IV. Municipal Liability

Finally, Defendants contend that Plaintiff's claims against the City of Aurora must fail because there is no evidence of a municipal custom or practice for purposes of municipal liability. [Doc. 184 at 17]. The Court's analysis is limited to the remaining First

and Fourth Amendment claims. The Parties' arguments do not distinguish between Plaintiff's different constitutional claims, *see* [Doc. 184 at 17–21; Doc. 201 at 18–21], and the Court follows suit.

"[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Government entities can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. It is the plaintiff's burden to identify a municipal custom or policy that caused the plaintiff's injuries. *Brown*, 520 U.S. at 403.

To succeed on a municipal liability claim, a plaintiff must prove that "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1253 (10th Cir. 2022).[12] An official policy or custom under *Monell* may take several forms, including:

---

[12] The Parties offer differing views of the requisite elements of a *Monell* claim. Defendants contend that, to succeed on his claims, Mr. McCormick must establish that the municipal policy in question was enacted with deliberate indifference to an almost inevitable constitutional injury. [Doc. 184 at 18–19]. Plaintiff disagrees; he insists that a showing of deliberate indifference is required only where there was an alleged failure to train or failure to supervise. [Doc. 201 at 18]. At least two courts in this District have come to opposing conclusions on this question. *Compare Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

But it is not enough for a plaintiff to simply identify a municipal policy or custom—the plaintiff must also "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. This means that "the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quotation omitted). This threshold is met if the plaintiff shows that the municipality was the "moving force" behind the alleged injury. *Id.* (quoting *Brown*, 520 U.S. at 404).

---

1164, 1175 n.4 (D. Colo. 2022) ("Deliberate indifference is required only for municipal liability based upon a failure to adequately train or supervise. Other claims require only the existence of a policy and causation." (citations omitted)), *with Dennis v. City & Cnty. of Denver*, No. 22-cv-00608-WJM-KAS, 2023 WL 5864117, at *4 (D. Colo. Sept. 11, 2023) (deciding that a plaintiff must show that the municipality "acted with deliberate indifference regardless of which theory of liability she asserts" (emphasis omitted)). While the Court does not find Plaintiff's view of the law unreasonable, the Court notes that the Tenth Circuit cases Plaintiff relies upon do not decisively hold that deliberate indifference is not required for certain theories of municipal liability. *See, e.g.*, *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). Moreover, the Tenth Circuit has recently included the deliberate-indifference element when reciting the elements of *Monell* liability even in cases where the plaintiff did not rely on a failure-to-train or failure-to-supervise theory. *See, e.g.*, *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023); *see also Arnold v. City of Olathe*, 35 F.4th 778, 795 (10th Cir. 2022); *Lance v. Morris*, 985 F.3d 787, 803–04 (10th Cir. 2021). The Court is bound by this precedent.

Finally, the plaintiff must demonstrate that the challenged policy was enacted with deliberate indifference.  A plaintiff may show deliberate indifference by adducing evidence that the municipality had actual or constructive notice that its action (or its failure to act) was substantially certain to result in a constitutional violation and that the municipality consciously and deliberately chose to disregard that risk.  *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022).  A municipality may be on notice through a pattern of tortious conduct or "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."  *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998)).  The requirements of *Monell* must be applied rigorously to avoid collapsing municipal liability into respondeat superior liability.  *Schneider*, 717 F.3d at 772.

 Mr. McCormick relies on the following types of municipal policies or customs to support his *Monell* claims against Aurora:  (1) a "widespread custom and practice of excessive use of force in the" Aurora Police Department; (2) inadequate training; and (3) ratification from final policymakers.  [Doc. 201 at 19–20].  The Court addresses each theory below.

**Informal Custom.**  "[A] custom is a practice that is so 'continuing, persistent, and widespread' that it has the force of law.'"  *Jensen v. W. Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020) (quotation omitted); *see also Bryson*, 627 F.3d at 788 (an unofficial policy or custom must be "so permanent and well settled as to constitute a custom or usage with the force of law"  (quotation omitted)).  Defendants contend that Mr. McCormick cannot adduce evidence of a widespread informal custom that caused his injuries.  [Doc. 184 at 18–19].  They further argue that he cannot demonstrate that any unofficial custom was

implemented with deliberate indifference.  [*Id.* at 19].  Mr. McCormick responds that "[t]here is extensive evidence of a widespread custom and practice of excessive use of force in the APD, which City policymakers have known about for years."  [Doc. 201 at 19]. He also says that he is not required to provide evidence of deliberate indifference with respect to an informal custom.  [*Id.* at 18].

Because Plaintiff contends that a showing of deliberate indifference is not necessary to defeat summary judgment on this theory (and thus directs the Court to no evidence supporting this element), he has failed to set forth evidence on an essential element of his claim, which is alone sufficient to grant summary judgment in Defendants' favor on this theory.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Accordingly, Mr. McCormick cannot proceed on a theory based on an informal, widespread custom.  *See Epps*, 2022 WL 21727363, at *8 (granting summary judgment in the defendant's favor on ratification theory where the plaintiffs did not respond to the defendant's argument and did not present evidence of ratification).

***Failure to Train.***  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983."  *City of Canton*, 489 U.S. at 389.

Defendants argue that Mr. McCormick cannot succeed on a failure-to-train theory because he "can point to no evidence here supporting a training deficiency closely related to any alleged injuries" and because he cannot adduce any evidence of "deficiencies in 'how the [officers] were trained, who they were trained by, why their training was deficient, or what the City's training includes and how it has changed since the alleged pattern began.'"  [Doc. 184 at 20 (quoting *Cook v. Whyde*, No. 20-cv-02912-PAB-STV, 2021 WL 4459051, at *16 (D. Colo. Sept. 29, 2021))].

Again, Plaintiff makes generalized arguments about causation but fails to direct the Court to any specific evidence, or make any specific argument, demonstrating how any specific failure to train caused Mr. McCormick's injuries.  *See* [Doc. 201 at 20 (arguing only that Aurora's "training" "led to the use of excessive force")].  As for deliberate indifference, Plaintiff contends that "[t]here is significant evidence of Aurora's failure to train its officers on crowd management, proper use of 'less-lethal' weapons, and use of force" and asserts that the "[v]iolation of persons' rights during protests is a highly predictable or plainly obvious consequence of Aurora's failure to train."  [*Id.* at 21].

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quotation omitted).  This is typically demonstrated by "proving the existence of a pattern of tortious conduct."  *Id.* (quotation omitted).  Only in a "narrow range of circumstances" will deliberate indifference be found without a pattern of unconstitutional behavior—such

as when "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* (cleaned up).

This narrow range of cases includes cases where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," *City of Canton*, 489 U.S. at 390, or if the case involves "technical knowledge or ambiguous 'gray areas' in the law that would make it 'highly predictable' that a [person in the officer's] position would need 'additional specified training' to know how to handle the situation correctly," *Waller*, 932 F.3d at 1288 (quoting *Connick*, 563 U.S. at 71).  In 2021, the Tenth Circuit adopted the Second Circuit's three-part test for assessing deliberate indifference, which requires the plaintiff to prove that (1) policymakers knew to a moral certainty that their employees would confront a given situation; (2) the situation presents the employee with a difficult choice that training would make less difficult; and (3) the wrong choice would frequently cause the deprivation of a citizen's constitutional rights.  *Lance v. Morris*, 985 F.3d 787, 802 (10th Cir. 2021) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *see also Valdez v. Macdonald*, 66 F.4th 796, 817 (10th Cir. 2023) (explaining that the *Lance* court adopted the three-part test).

Plaintiff does not direct the Court to any evidence that any specific Aurora decisionmakers were on notice of any particular training deficiency.  *See* [Doc. 201 at 20–21].  Although Plaintiff highlights reports from by the Colorado Attorney General and 21CP Solutions prepared after the protests detailing deficiencies in Aurora's training, *see* [*id.* at 21; *id.* at 11, ¶ 17], Plaintiff does not explain how this evidence shows that Aurora

decisionmakers were on notice of any particular training deficiencies prior to the protests, *see* [*id.* at 20–21]; *see also Marck v. City of Aurora*, No. 21-cv-01071-0WJM-SKC, 2022 WL 889175, at *10 (D. Colo. Mar. 25, 2022) ("The Court finds that the 2021 report is irrelevant to the question of whether the City was aware of problems in its training procedures in 2019.").  The Court assumes, then, that Plaintiff believes this case falls within the narrow range of cases where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390.

However, Plaintiff makes *no* argument explaining why this is such a case.  *See* [Doc. 201 at 21].  Plaintiff's argument that "[v]iolation of persons' rights during protests is a highly predictable or plainly obvious consequence of Aurora's failure to train," without any citations to legal authority or evidence, is insufficient.  The Court cannot conclude that this is such a case absent any argument from Plaintiff, as the Court cannot make arguments for Plaintiff or analyze potential theories on Plaintiff's behalf, especially where a "deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also Brown*, 520 U.S. at 410 (instructing that "'deliberate indifference' is a stringent standard of fault").   Accordingly, Mr. McCormick cannot succeed on his *Monell* claims based on a failure to train.  *See George*, 32 F.4th at 1255 (affirming summary judgment in defendant's favor where the plaintiff "offer[ed] no evidence of a pattern of constitutional violations" and "[did] not argue that proving a pattern of constitutional violations is unnecessary").

*Ratification.*   Mr. McCormick also asserts *Monell* claims based on a ratification theory, asserting that "Aurora policymakers (specifically, undisputed final policymaker Chief Wilson) ratified its officers' excessive force by commending, rather than condemning, officers' acts."  [Doc. 201 at 19].  Defendants challenge Mr. McCormick's ratification theory on the grounds that a failure to discipline does not amount to ratification of a person's conduct and the basis for that conduct.  [Doc. 184 at 20].

"[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."   *Bryson*, 627 F.3d at 790.   Furthermore, "[t]he final decisionmakers' approval must precede the violative action, and the Tenth Circuit has rejected ratification based on conduct after the violation has occurred."  *Lucio-Vasquez v. City of Aurora*, No. 21-cv-02756-WJM-MDB, 2023 WL 2891009, at *10 (D. Colo. Apr. 11, 2023); *see also Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[les] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." (emphasis in original)).

The Court respectfully agrees with Defendants.  The Tenth Circuit has instructed that "[f]ailing to adequately . . . punish does not count as ratification."  *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.,* 786 F. App'x 774, 787 (10th Cir. 2019); *see also Lucio-Vasquez*, 2023 WL 2891009, at *10 (ratification typically must precede the challenged conduct).  Mr. McCormick's reliance on conduct occurring *after* the alleged constitutional violation—the alleged approval of all Aurora officers' conduct—is insufficient to support his *Monell* claim.  *Cordova*, 569 F.3d at 1194.

For all of these reasons, the Court concludes that Mr. McCormick has not met his burden on summary judgment with respect to his *Monell* claims against the City.   The Motion for Summary Judgment is thus **GRANTED** as to his First and Fourth Amendment claims asserted against Aurora.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Aurora Defendants' Motion for Summary Judgment [Doc. 184] is **GRANTED in part** and **DENIED in part**;

(2)   The Motion is granted with respect to all claims against the City of Aurora;

(3)   The City of Aurora is **DISMISSED** as a Defendant in this case;

(4)   The Motion is granted as to the Fourteenth Amendment claim against Officer Winters;

(5)   The Motion is denied as to the First Amendment and Fourth Amendment claims against Officer Winters; and

(6)   This Court will set this case for a telephonic status conference for purposes of setting this case for trial after the resolution of Plaintiffs' Motion to Sever Tyson McCormick's Claims Under Rule 21, and, in the Alternative, Order Separate Trials Under Rule 42(b) [Doc. 168].

DATED:  March 1, 2024                              BY THE COURT:

Nina Y. Wang
United States District Judge