**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01213-NYW-KAS

TEJAS COUSIK,
TARIN ALLEN,
JAKE DOUGLAS,
ALEJO GONZALEZ,
JEREMY HEDLUND,
ROBERT HELMICK,
PHILLIP LOPEZ,
TYSON MCCORMICK,
BRIANNE SANCHEZ,
EMMA SMEDBERG,
JAMES WILLIAMS,
MARIAH WOOD, and
ABIGAIL ZINMAN,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER, COLORADO,
CITY OF AURORA, COLORADO, and
JOSHUA WINTERS, AURORA POLICE OFFICER,

       Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant Denver's Motion for Summary Judgment (the "Motion" or "Motion for Summary Judgment") [Doc. 175]. Upon review of the Motion and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of this matter. For the reasons set forth below, the Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises from the protests that occurred in May and June 2020 after the murder of George Floyd.  Thirteen Plaintiffs—Tejas Cousik, Tarin Allen, Jake Douglas, Alejo Gonzalez, Jeremy Hedlund, Robert Helmick, Phillip Lopez, Tyson McCormick, Brianne Sanchez, Emma Smedberg, James Williams, Mariah Wood, and Abigail Zinman (collectively, "Plaintiffs")—bring claims against the City and County of Denver, Colorado ("Defendant" or "Denver")[1] for alleged violations of their constitutional rights during those protests.  *See generally* [Doc. 133].  Plaintiffs assert three claims for municipal liability against Denver under 42 U.S.C. § 1983:  (1) a First Amendment retaliation claim; (2) a Fourth Amendment excessive force claim; and (3) a Fourteenth Amendment due process claim.  [*Id.* at ¶¶ 497–526].

## LEGAL STANDARD

Under Rule 56 of the Federal Rule of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

Where the movant does not bear the ultimate burden of persuasion at trial, the movant does not need to disprove the other party's claim; rather, the movant must only

---

[1] For purposes of clarity, although there are other named Defendants in this action, the Court will refer to the City and County of Denver as the singular "Defendant" in this Order.

point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views each motion "in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## UNDISPUTED MATERIAL FACTS

The facts of this case are largely disputed, and the Court focuses here on the limited facts on which the Parties agree.[2] On May 27, 2020, the Denver Police

---

[2] Both sides attempt to dispute certain statements of fact presented by the other side, but only dispute a portion of the disputed fact. In this circumstance, the Court construes the non-objected-to portion of the statement undisputed for purposes of this Order without further note from the Court. *See* Fed. R. Civ. P. 56(e). To the extent Plaintiffs attempt to raise legal arguments about the admissibility of certain evidence, *see, e.g.*, [Doc. 197 at 5, ¶¶ 34–39], it is well settled that a party need not produce evidence in a form that would be admissible at trial; instead, only the content or substance of the evidence must be admissible at trial, *see Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995); *see also* Fed. R. Civ. P. 56(c)(2) (a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). Plaintiffs do not argue that the evidence cited cannot be presented in an admissible form at trial. *See generally* [Doc. 197]. Furthermore, the undersigned's Uniform Civil Practice Standards state that "[l]egal argument is not permitted [in the response to statement of undisputed material facts] and should be reserved for separate portions of the briefs." *See* NYW Civ. Practice Standard 7.1D(b)(7). The Court thus does not consider Plaintiffs' admissibility arguments at this stage in the proceedings. *See Troudt v. Oracle Corp.*, No. 16-cv-00175-REB-SKC, 2019 WL 1006019, at *3 (D. Colo. Mar. 1, 2019) (declining to consider "undeveloped" hearsay objections at the summary-judgment stage).

Department ("DPD") learned of possible protest activity in Denver.  [Doc. 175 at ¶ 1; Doc. 197 at 2; Doc. 175-1 at 108:20–24].[3]  Special Operations Commander Patrick Phelan ("Commander Phelan") was engaged as the Incident Commander and was responsible for developing a response plan, allocating available resources, and making decisions concerning DPD's response to the protests.  [Doc. 175 at ¶ 2; Doc. 197 at 2; Doc. 175-1 at 26:9–25; id. at 27:11–19].  Commander Phelan was not in the field during the protests. [Doc. 175 at ¶ 20; Doc. 197 at 4, ¶ 20; Doc. 175-1 at 35:3–10].   During the protests, Denver officers used "less lethal" munitions as part of their response to the protests; "less-lethal" force is "a force application which meets the operational or tactical objective" and is not intended to cause death or serious bodily injury.  [Doc. 175 at ¶ 15; Doc. 197 at 3, ¶ 15; Doc. 177-2 at 4].[4]  Starting on the "second day of the protests," Denver required assistance from other jurisdictions under mutual aid principles.  [Doc. 175 at ¶ 28; Doc. 197 at 2; Doc. 175-1 at 146:1–12].  Plaintiffs claim that they were injured during the protests from May 28 to May 31, 2020.  See [Doc. 197 at 6–11, ¶¶ 4–32; Doc. 212 at 5–10, ¶¶ 4–32].

---

[3] When citing to transcripts, the Court cites to the page and line numbers appearing on the original transcript pages but to the document number generated by the CM/ECF system.  When citing to video evidence, the Court cites to the timestamp reflected on the video footage whenever possible.

[4] Plaintiffs dispute this assertion by saying that "'less-lethal weapons can (and did) cause death or serious injury when used inappropriately."  [Doc. 197 at 3, ¶ 5].  But this statement does not dispute the assertion that less-lethal weapons are not intended to cause death or serious bodily injury; thus, the Court deems this fact undisputed.  Fed. R. Civ. P. 56(e).

**ANALYSIS**

Defendant seeks summary judgment on Plaintiffs' claims in their entirety.[5]   It asserts that (1) Plaintiffs cannot succeed on their First Amendment claims, [Doc. 175 at 9–10]; (2) Plaintiffs' Fourteenth Amendment due process claims fail as a matter of law, [*id.* at 12]; (3) Plaintiffs' Fourth Amendment claims "not resulting in a seizure fail to state viable claims," [*id.* at 13 (emphasis omitted)]; (4) Plaintiffs fail to meet the requirements of municipal liability, [*id.*]; and (5) Denver cannot be held liable for the actions of Officer Winters, an Aurora police officer sued in his individual capacity, [*id.* at 20].   The Court addresses the Parties' arguments as to the merits of each claim, then addresses the viability Plaintiffs' municipal liability claims as a whole, and then finally addresses Denver's arguments about its liability for Officer Winters's actions.

**I.   First Amendment Retaliation[6]**

"[A]ny form of official retaliation for exercising one's freedom of speech . . . constitutes an infringement of that freedom."  *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotation omitted).   To prevail on a First Amendment retaliation claim, a plaintiff must prove the following:

---

[5] Denver first argues that the court rulings and jury verdict in *Epps v. City and County of Denver*, Case No. 20-cv-01878-RBJ, are not binding on this Court in this action.  *See* [Doc. 175 at 9].  Plaintiffs concede that this Court is not bound by *Epps*.  [Doc. 197 at 1]. The Court finds that it is not bound by the determinations of the *Epps* court and jury.  *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *see also Hernandez v. Ray Domenico Farms, Inc.*, 250 F. Supp. 3d 789, 801 (D. Colo. 2017) ("Although the judges of this District strive to respect each other's decisions, we do not bind each other.").

[6] Denver argues in its Motion that there is no First Amendment claim based on the use of force itself, but instead, the only viable claim under the First Amendment would be a retaliation claim.  *See* [Doc. 175 at 9].  Plaintiffs do not directly respond to this argument or clarify their first claim, but they do proceed as if their First Amendment claim is based on a retaliation theory.  *See* [Doc. 197 at 15–17].  Accordingly, the Court construes Plaintiffs' First Amendment claim as a First Amendment retaliation claim.

(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).  Defendant argues that Plaintiffs cannot satisfy either the second or third elements of their claims.  *See* [Doc. 175 at 10].  However, in the Court's view, Denver fails to develop any challenge to the second element, going straight into an argument that Plaintiffs cannot establish that their protected activity was a substantial or motivating factor causing Plaintiffs' injuries.  *See* [*id.* at 10–11].  The Court thus limits its analysis to this element.  *See Watkins v. Wunderlich*, No. 22-1358, 2023 WL 4145904, at *11 n.11 (10th Cir. June 23, 2023) (underdeveloped arguments are deemed waived).

Defendant contends that Plaintiffs cannot adduce any evidence that "the actions of the specific officers who used force directed at Plaintiffs . . . were substantially motivated as a response to each Plaintiff's exercise of First Amendment rights."  [Doc. 175 at 10].[7]  Plaintiffs respond that whether Denver officers were motivated by Plaintiffs'

---

[7] Defendant contends that Plaintiffs "are required to establish 'but-for' causation to meet this element."  [Doc. 175 at 10].  The authority cited by Defendant, however, is not specific to First Amendment retaliation claims arising from civil demonstrations.  It has long been established that, in public employment cases, once the plaintiff shows that the retaliatory animus was the substantial or motivating factor in an adverse action, the burden shifts to the defendant to prove that it would have taken the same action even absent the protected activity, i.e., the absence of but-for causation.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 309 (6th Cir. 2023).  Although this burden-shifting approach is most commonly used in the public employment context, the Supreme Court has described this approach as appropriate in "ordinary" retaliation cases.  *See Hartman v. Moore*, 547 U.S. 250, 260 (2006); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1736 (2019) (Sotomayor, J., dissenting) ("The standard framework for distinguishing legitimate exercises of governmental authority from those intended to chill protected speech is well established."

protected activity is a question of fact that should be left to the jury and disputed facts preclude summary judgment on this basis. [Doc. 197 at 16]. They assert that Denver officers' unlawful motive "is supported by a wide swath of evidence, including the fact that officers used unwarned force against Plaintiffs while they were engaged in peaceful protest activity." [*Id.* (emphasis omitted)]. In Plaintiffs' view, Denver officers' "indiscriminate use of force on peaceful protestors supports a reasonable inference that Plaintiffs' protected activity was a substantial or motivating factor in the officers' actions." [*Id.* at 16–17].[8]

---

(citing *Mt. Healthy*, 429 U.S. at 287)). In addition, the Courts of Appeals for the Ninth and Eleventh Circuits both include this burden-shifting framework in their respective pattern jury instructions for First Amendment retaliation claims.

The Supreme Court has recognized two exceptions to this approach: retaliatory prosecution cases and retaliatory arrest cases. To succeed on these types of First Amendment claims, the plaintiff must also make a threshold showing that there was no probable cause supporting the prosecution or arrest. *See Hartman*, 547 U.S. at 260–61; *Nieves*, 139 S. Ct. at 1725. But if the plaintiff makes that threshold showing, "then the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [adverse action], and, if that showing is made, the defendant can prevail only by showing that the [adverse action] would have been initiated without respect to retaliation." *Nieves*, 139 S. Ct. at 1725 (quotation omitted). Thus, it appears that the *Mt. Healthy* framework applies not just in the public employment context, but to all First Amendment retaliation cases. *Colonies Partners LP v. Cnty. of San Bernardino*, No. 5:18-cv-00420-JGB-SHK, 2020 WL 5102160, at *23 (C.D. Cal. July 28, 2020) (discussing the burden-shifting framework). Because the Parties do not brief this issue on this authority, the Court does not definitively rule on this issue, but puts the Parties on notice of this outstanding issue that must be resolved prior to trial.

[8] The Court respectfully disagrees with Plaintiffs' assertion that a communication from the DPD about enforcing the curfew ordinance only on protestors demonstrates that the use of force on Plaintiffs was motivated by their protected activity. *See* [Doc. 197 at 17]. Plaintiffs do not provide any supporting argument explaining why this communication evinces that Denver officers acted with a retaliatory animus in using force against Plaintiffs, *see [id.]*, and the Court cannot construct arguments on behalf of Plaintiffs, *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795, 803 (10th Cir. 2016).

Whether a defendant acted with a retaliatory animus is typically a fact question left to the jury. *Hedquist v. Beamer*, 763 F. App'x 705, 712 (10th Cir. 2019). However, summary judgment may still be appropriate if there is no evidence from which a reasonable jury could find that the protected activity was a motivating factor in the adverse action. *Id.*

Plaintiffs fail to raise meaningful arguments specific to each Plaintiff and fail to direct the Court to Plaintiff-specific evidence, instead directing the Court generally to 33 separate assertions of fact contained elsewhere in their brief, which are collectively supported by dozens of exhibits. *See* [Doc. 197 at 16 (citing *id.* at 2, ¶ 6; *id.* at 6–11, ¶¶ 1–32)]. Nevertheless, the Court has reviewed the evidence cited by Plaintiffs and observes that they have adduced evidence that each Plaintiff was hit with projectiles and/or was tear gassed while peacefully protesting. *See* [Doc. 198-62 at 3 (Allen); Doc. 198-12 at 14:9–22, 21:16–22:14 (Cousik); Doc. 198-15 at 84:4–12 (Douglas); Doc. 198-6 at 95:1–14 (Gonzalez); Doc. 198-17 at 75:3–24 (Hedlund); Doc. 198-18 at 59:20–60:3, 61:4–12 (Helmick); Doc. 198-21 at 64:16–65 (Lopez); Doc. 198-29 at 142:7–153:25 (McCormick); Doc. 198-27 at 3–4 (Sanchez); Doc. 198-13 at 39:19–40:14 (Smedberg); Doc. 198-70 at 4 (Williams); Doc. 198-16 at 42:16–43:17, 75:16–77:1 (Wood); Doc. 198-14 at 78:10–79:13 (Zinman)].

The Court does not weigh this evidence or pass on the strength of this evidence, but concludes that given the fact that a reasonable jury could find that Plaintiffs were peacefully protesting *at the time* that DPD officers allegedly shot them with projectiles and/or tear gassed them, a reasonable jury could conclude that the peaceful protesting was the substantial or motivating factor behind the officers' conduct. *See Epps v. City &*

*Cnty. of Denver*, 588 F. Supp. 3d 1164, 1176 (D. Colo. 2022) (denying summary judgment where the plaintiffs "present[ed] evidence that they did not engage in destructive activity, and that many officers used force in situations that support an inference of retaliatory motive, such as tear gassing kneeling protestors chanting 'Hands Up Don't Shoot' or shooting a plaintiff through her 'Black Lives Matter' sign").  Indeed, "[c]ourts around the country . . . have agreed that the use of force against non-violent protestors can support the inference that officers meant to intimidate protestors and deter antipolice messaging." *Huffman v. City of Bos.*, No. 21-cv-10986-ADB, 2022 WL 2308937, at *6 (D. Mass. June 27, 2022) (collecting cases).  While the Court acknowledges that many of the cases cited in *Huffman* were decided at the pleading stage or in the context of a motion for injunctive relief, *see, e.g.*, *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 269 (S.D. Ohio 2021) (granting preliminary injunction and concluding that "[t]he use of force on nonviolent protestors and congregants raises a serious question if officers acted in reaction to the protests' antipolice message and aimed to intimidate protestors to deter such speech"), which implicate materially different legal standards than those present here, the Court still finds support in the case law for Plaintiffs' assertion that using force against peaceful protestors may create an inference that the use of force against those protestors was due to their protected activity—and thus, a reasonable jury could draw that inference.  *See Llera v. Las Vegas Metro. Police Dep't*, No. No. 2:20-cv-01589-RFB-BNW, 2023 WL 6393092, at *6 (D. Nev. Sept. 30, 2023) ("Defendant Squeo's retaliatory conduct occurred during the protest.  This short 'proximity in time between' between Decedent's conduct and Defendant[] Squeo's retaliatory conduct supports an inference that Defendant Squeo retaliated against Decedent in violation of his First Amendment rights." (quotation

omitted)).  Defendant's contention that "[t]he officers' uses of force occurred not because of protest activity or to target protestors, but because along with the protestors, there were others in attendance at the protests engaged in violence attempting to injure police officers or engaged in destruction of property," [Doc. 175 at 11], is more appropriately presented to the jury, *see Epps*, 588 F. Supp. 3d at 1176.

Finally, while Defendant contends that Plaintiffs must, to survive summary judgment, present specific evidence about the intent of each individual officer who deployed force against each Plaintiff, *see* [Doc. 175 at 11]; *see also* [Doc. 212 at 13–14 (suggesting that Plaintiffs must identify the specific Denver officers who engaged in retaliation)], this assertion is not supported by any on-point legal authority, *see* [Doc. 175 at 11].  Individual liability, of course, requires proof of the individual defendant's conduct and retaliatory motives.  *See, e.g.*, *A.M. v. Holmes*, 830 F.3d 1123, 1163 (10th Cir. 2016).  But the Court could not locate any authority requiring such officer-specific proof where a plaintiff does not seek to impose individual liability on any particular officer, and the Court of Appeals for the Tenth Circuit ("Tenth Circuit") recently observed that "while unusual, municipal liability may exist without individual liability."  *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023).  It is not this Court's duty to search for authority in support of Defendant's argument.  *See Phoenix Ins. Co. v. Trinity Universal Ins. Co. of Kan.*, No. 12-cv-01553-REB-KLM, 2013 WL 4594529, at *2 (D. Colo. Aug. 29, 2013).  The Court cannot conclude that Defendant has demonstrated that it is entitled to summary judgment on Plaintiffs' First Amendment claims on these grounds.

## II.     Fourteenth Amendment Due Process

Defendant also challenges Plaintiffs' Fourteenth Amendment due process claims. [Doc. 175 at 12].  Defendant first contends that excessive force claims must be addressed under the Fourth Amendment, rather than the substantive component of the Due Process Clause.  [*Id.*].  Plaintiffs disagree, arguing that an excessive force claim is properly "analyzed under the Fourth Amendment if it involves a seizure and the Fourteenth Amendment if it does not."  [Doc. 197 at 19].  Denver does not respond to this argument in its Reply.  *See* [Doc. 212].

The Court respectfully disagrees with Denver.  "Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment . . . and each carries with it a very different legal test."  *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010).  Determining what constitutional amendment applies depends on what stage of the criminal justice system the plaintiff is in.  *Est. of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014).  For example, the Eighth Amendment applies to claims of excessive force raised by convicted prisoners; the Fourth Amendment applies to claims asserted by arrestees; and the Fourteenth Amendment applies to pretrial detainees' excessive force claims.  *Id.*; *see also Porro*, 624 F.3d at 1325; *Colbruno v. Kessler*, 928 F.3d 1155, 1165 (10th Cir. 2019).  But if the plaintiff has not entered the criminal justice system and there has been no seizure at all, the Fourteenth Amendment governs excessive force claims. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003); *Roybal-Mack v. N.M. Dep't of Pub. Safety*, 286 F. Supp. 3d 1226, 1234–36 (D.N.M. 2017); *Mahdi v. Salt Lake Police Dep't*, 54 F.4th 1232, 1236 (10th Cir. 2022).

Plaintiffs contend that their Fourteenth Amendment excessive force claims are appropriate alternative claims to the Fourth Amendment excessive force claims unless and until Defendant concedes that Plaintiffs were seized.  *See* [Doc. 197 at 19].  Given that Defendant contends that Plaintiffs were not seized, *see* [Doc. 175 at 13], the Court finds no basis to conclude that Plaintiffs cannot proceed on their Fourteenth Amendment claims under *Roska*, *see* Fed. R. Civ. P. 8(d)(2); *Gramercy Distressed Opportunity Fund II L.P. v. Piazza*, No. 22-8050, 2023 WL 6296948, at *2 (10th Cir. May 10, 2023) (observing that the Federal Rules of Civil Procedure do not preclude pleading in the alternative, "[b]ut even when a party pleads in the alternative, there may come a point at which a choice must be made").

In the alternative, Defendant contends that Plaintiffs cannot meet the "extremely high" burden of demonstrating that Defendant's officers engaged in conscience-shocking conduct.  [Doc. 175 at 12].  Defendant notes that Plaintiffs must "do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power" and argues that "[w]hat occurred concerning Plaintiffs simply does not rise to the threshold necessary to state a cognizable substantive due process claim."  [*Id.*].  Plaintiffs respond first that Defendant's Fourteenth Amendment argument is "undeveloped" and "waived."  [Doc. 197 at 19].  The Court respectfully disagrees with this suggestion.  It is Plaintiffs' burden to prove conscience-shocking conduct.  *See Radecki v. Barela*, 146 F.3d 1227, 1229 (10th Cir. 1998); *Hall v. Ramsey Cnty.*, 801 F.3d 912, 918 (8th Cir. 2015).  Because Defendant does not bear the ultimate burden of persuasion at trial, Defendant need not negate Plaintiffs' Fourteenth Amendment claim; rather, Defendant simply must "point[] out to the court a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. The burden then shifts to Plaintiffs "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (quotation omitted). While Defendant's argument is not robust, the Court finds it sufficient to shift the burden to Plaintiffs to establish a triable issue of fact on their Fourteenth Amendment claims.

"An excessive force claim under the Fourteenth Amendment targets arbitrary governmental action, taken without due process." *Est. of Booker*, 745 F.3d at 423 (quotation omitted). To succeed on such a claim, the plaintiff must demonstrate that the challenged conduct "shocks the conscience." *Mahdi*, 54 F.4th at 1236 (quoting *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019)). The Tenth Circuit has instructed that there are "two different standards to apply the shocks-the-conscience test," the application of which depends on "whether the state actor had time to deliberate before engaging in the complained-of conduct." *Id.* If the actor had time to deliberate—i.e., had "time for unhurried judgments and repeated reflection" and the "opportunity for attention," with "no substantial pulls of competing obligations," conduct will shock the conscience of it is deliberately indifferent to a person's life or security. *Id.* at 1236–37 (quotation omitted). But if there was no opportunity to deliberate, the plaintiff must show that the conduct was "done with the intent to harm the injured party." *Id.* "Stated differently, 'when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness' is not conscience-shocking." *Shaw v. City of Norman*, No. 22-6106, 2023 WL 2923962, at *2 (10th Cir. Apr. 13, 2023) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998)).

Plaintiffs do not address either standard in their Response.  *See generally* [Doc. 197 at 19].  Instead, they assert generally that "[a] jury could conclude" that the challenged conduct "shocks the conscience and constitutes a clear abuse of government authority" because Defendant's officers "unleashed lethal force against Plaintiffs engaged in peaceful protest activity, caused significant injury, and acted with improper motive and malice towards Plaintiffs based on their protest activity against police use of force," citing broadly to 38 separate paragraphs of material facts.  [*Id.*].  But before determining whether Plaintiffs have put forth sufficient evidence to survive summary judgment, the Court must make a threshold determination as to which test applies to Plaintiffs' claims.  *See Perez v. Unified Gov't of Wyandotte Cnty.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005).  Plaintiffs fail to raise any argument explaining their position as to whether the deliberate-indifference standard or intent-to-harm standard applies, and it is not this Court's role to craft arguments on behalf of parties or search the exceedingly voluminous case record for evidence in support of multiple potential theories of relief for each of the thirteen Plaintiffs.  *Lebahn v. Owens*, 813 F.3d 1300, 1308 (10th Cir. 2016); *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022).  Indeed, the determination of the appropriate legal standard in this context is highly fact specific, *see Browder v. Casaus*, 675 F. App'x 845, 847–48 (10th Cir. 2017), and while the thirteen Plaintiffs assert similar factual allegations, their claims are not identical, and there may be certain specific factual circumstances with respect to each Plaintiff's claim that are material to the legal standard determination.  And even if the Court assumed that the less-stringent "deliberate indifference" standard applies, Plaintiffs make no argument demonstrating that this

standard is satisfied in this case with respect to each Plaintiff.  *See* [Doc. 197 at 19 (raising only a cursory argument as to Plaintiffs collectively)].

Because Plaintiffs fail to address the appropriate legal standard and do not direct the Court to evidence related to that standard, the Court finds that summary judgment in Defendant's favor on the Fourteenth Amendment claims is appropriate.  *Cf. Shaw*, 2023 WL 2923962, at *4 (affirming denial of due process claim where the plaintiffs made "no attempt to satisfy" the applicable intent-to-harm standard); *OneSource Com. Prop. Servs., Inc. v. City & Cnty. of Denver*, 535 F. App'x 740, 748 (10th Cir. 2013) (affirming grant of summary judgment in the defendant's favor where the plaintiffs inadequately briefed their claims and failed to establish genuine issues of material fact); *see also Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 41 (10th Cir. 2013) (declining to consider arguments that fail to address the correct legal standard).   Accordingly, the Motion for Summary Judgment is **GRANTED** with respect to Plaintiffs' Fourteenth Amendment claims.

### III.   Fourth Amendment Excessive Force

Claims alleging that a police officer used excessive force in the seizure of a free citizen are properly asserted under the Fourth Amendment, *Graham v. Connor*, 490 U.S. 386, 395 (1989), which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," U.S. Const. amend. IV.  To succeed on a Fourth Amendment excessive force claim, a plaintiff must prove that they were seized and that the seizure was unreasonable.   *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989); *see also Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015) ("Without a seizure, there can be no violation of the Fourth Amendment.").

Defendant contends that "Plaintiffs' Fourth Amendment claims not resulting in a seizure fail to state viable claims." [Doc. 175 at 13]. It asserts that a seizure does not result from the use of chemical agents or PepperBalls "in an area saturation manner that do not physically touch a person or cause the person to submit to the officers' show of authority." [*Id.*]. In its Reply, Denver clarifies that it "does not argue any Plaintiff who was actually struck by a projectile does not have a potential Fourth Amendment claim"; rather, it contends that any claims based on allegations that Plaintiffs were "subjected to chemical agents or exploded PepperBalls not physically touching" any Plaintiff are not cognizable. [Doc. 212 at 16–17]. It specifically references 16 paragraphs in the Third Amended Complaint that it contends fail to give rise to a viable Fourth Amendment claim. *See* [Doc. 175 at 13 (citing Doc. 133 at ¶¶ 99, 112, 123, 154, 161, 181, 192,[9] 221, 279, 303, 315, 340, 352, 392, 411 (footnote added))].[10] The Court's analysis is limited accordingly to the extent Plaintiffs' Fourth Amendment claims are or could be based only

---

[9] Defendant cites paragraph 192 of the Third Amended Complaint, which states that "[o]ne or more DPD officers indiscriminately threw chemical munitions and explosive devices into the crowd for no apparent reason." [Doc. 133 at ¶ 192]. The immediately preceding paragraph, however, is the allegation that is specific to certain Plaintiffs, alleging that Plaintiffs Douglas and Wood "were tear gassed repeatedly during this time" and "were also gassed as they were leaving around the time of curfew." [*Id.* at ¶ 193].

[10] These allegations are summarized as follows: Plaintiff Gonzalez inhaled aerosolized chemicals, was tear gassed, and inhaled a "significant amount" of gas deployed by police officers, and experienced coughing, difficulty breathing, and irritation and burning of his eyes, nose, throat, mouth, and skin. [Doc. 133 at ¶¶ 99, 112, 123, 154, 161]. Plaintiff Allen was tear gassed and experienced coughing, difficulty breathing, and irritation and burning in her eyes, nose, throat, mouth, and skin. [*Id.* at ¶ 181]. Plaintiffs Douglas, Wood, Cousik, Smedberg, Zinman, Sanchez, Hedlund, Helmick, Lopez, McCormick, and Williams experienced tear gas and/or pepper spray or other chemicals, which caused coughing, difficulty breathing, and irritation and burning in their eyes, nose, throat, mouth, and skin. [*Id.* at ¶¶ 192–93, 221, 279, 303, 315, 340, 352, 392, 411].

on tear gassing, pepper spraying, and/or the deployment of other chemicals *without* any physical force on Plaintiffs' bodies.

Defendant's argument relies on *Brower v. County of Inyo*, where the Supreme Court stated that a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *See* 489 U.S. at 596.  Plaintiffs respond that this authority has been overruled by *Torres v. Madrid*, 592 U.S. 306 (2021).  *See* [Doc. 197 at 17–18].  In *Torres*, the question before the Supreme Court was whether the application of physical force to a person, with the intent to restrain, may constitute a seizure even if the force does not restrain the person.  *See* 592 U.S. at 309.  The Court answered this question affirmatively. *Id.*  In so doing, it clarified the distinction between seizures by *control* and seizures by *force*.  *See id.* at 322.  A seizure by control requires either the voluntary submission to a show of authority or the termination of freedom of movement, while a seizure by force does not.  *Id.* at 322–23.  The *Torres* Court reiterated that where the government seizes a person by acquisition of control, that person must "be stopped by the very instrumentality set in motion or put in place in order to achieve that result."  *Id.* at 322 (quoting *Brower*, 489 U.S. at 599).  But where the seizure is by force, no physical control is required.  *Id.* So it is not entirely accurate to state that *Torres* "overruled" *Brower*, which involved a seizure by *control* and held that physical acquiescence was required for force to amount to a seizure; rather, *Torres* simply clarified that a seizure by *force* does not have this same requirement.  *See also Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022) ("A seizure can occur in one of two ways:  (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." (citing *Torres*, 141 S. Ct. at 998)); *Shields v. Wiegand*, No. 5:20-cv-02999-GJP, 2023 WL

8005296, at *5 (E.D. Pa. Nov. 17, 2023) ("Post-*Torres*, two types of seizures exist: seizures by acquisition of control and seizures by force. . . .  A seizure by acquisition of control involves either the termination of freedom of movement or voluntary submission to a show of authority. . . .  This requirement of control or submission, however, does not extend to seizures by force." (quotation omitted)).

Plaintiffs next contend that when Defendant's officers used "gas or herding tactics to disperse or restrain Plaintiffs," Plaintiffs were seized because "these tactics restricted their freedom of movement."  [Doc. 197 at 18]; *see also* [*id.* (Plaintiffs arguing that their freedom of movement was restricted "when they were gassed, shot or shot at with projectiles, and had explosive devices (e.g., flashbangs[)] thrown at them")].  The Court construes this argument as an assertion that Plaintiffs were seized by acquisition of control, which, under *Torres*, requires "either voluntary submission to a show of authority or the termination of freedom of movement."  *Torres*, 592 U.S. at 322.

Although Plaintiffs conclude that the use of tear gas or other chemicals restricted their freedom of movement, they cite no legal authority demonstrating that the use of chemical agents, *alone*, necessarily constitutes a Fourth Amendment seizure.  *See* [Doc. 197 at 18].[11]  Nor do Plaintiffs clearly direct the Court to *any* evidence in support of their

---

[11] Indeed, the decisions cited by Plaintiffs went through detailed, fact-specific analyses before concluding that there was a seizure.  *See, e.g.*, *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 263–65 (S.D. Ohio 2021) (in preliminary injunction context, finding that the plaintiffs were likely to succeed on their Fourth Amendment claim and concluding that "[t]he impact that chemical irritants . . ., such as tear gas [and] pepper spray . . . had on the congregants" supported their argument that they were seized because "the impact of the pepper spray often literally rendered the protestor unable to move freely" and "the evidence establishe[d] much more than a minimal intrusion on the protestors' bodily integrity; many of the protestors suffered disorientation or were otherwise physically impacted").  And in *Jennings v. City of Miami*, No. 1:07-cv-23008-JEM, 2009 WL 413110 (S.D. Fla. Jan. 27, 2009), the court concluded that the plaintiffs' allegations were sufficient

argument that the use of chemical agents alone restricted their freedom of movement or resulted in the acquiescence of physical control, instead citing generally to 32 paragraphs of asserted facts, without differentiating between which Plaintiffs were allegedly seized via chemical agents and which were seized "when they were . . . shot or shot at with projectiles, [or] had explosive devices . . . thrown at them[]." [*Id*.]. At best, in those 32 assertions of fact, Plaintiffs state that Plaintiffs Zinman, Smedberg, and Cousik were "gassed and funneled into a very small alleyway, where many protestors were injured, coughing, and stumbling over each other." [*Id*. at 8, ¶ 16]. They also assert that Plaintiffs Wood and Douglas were "marching on Colfax when suddenly there were lines of officers in front and behind them, who gassed them from both sides." [*Id.* at 9, ¶ 18].

As for Plaintiffs Allen, Gonzalez, Hedlund, Helmick, Lopez, McCormick, Sanchez, and Williams, Plaintiffs do not argue or direct the Court to any evidence suggesting that the use of chemical agents on these Plaintiffs resulted in the acquisition of control of these Plaintiffs. *See generally* [*id*.]. Thus, they have not adduced any evidence of a requisite element of a Fourth Amendment seizure by control, and no reasonable jury could find in favor of these Plaintiffs on their Fourth Amendment claims to the extent they are based on an alleged seizure using chemical agents alone. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** with respect to the Fourth Amendment claims of Plaintiffs Allen, Gonzalez, Hedlund, Helmick, Lopez, McCormick, Sanchez, and Williams,

---

to allege a Fourth Amendment seizure where they alleged that police not only sprayed them with tear gas and pepper spray, but also shot them with "shotgun-based projectiles and other weapons" and created a "encirclement perimeter" to "force the demonstrators in a desired direction." *Id.* at *9. *Jennings* does not support the proposition that the use of chemicals alone is sufficient to constitute a seizure.

only to the extent these claims assert a theory that these Plaintiffs were seized by the use of chemical agents on these Plaintiffs.[12]

As for the other Plaintiffs, the Response could reasonably be read to argue that Plaintiffs Zinman, Smedberg, Cousik, Douglas, and Wood had their freedom of movement terminated when they were tear gassed.  Plaintiffs first assert that Plaintiffs Zinman, Smedberg, and Cousik "were gassed and funneled into a very small alleyway, where many protestors were injured, coughing, and stumbling over each other." [Doc. 197 at 8, ¶ 16].  In support, Plaintiffs cite the deposition testimony of Plaintiff Smedberg, wherein she stated:

> Q.  So I want to -- if you could, to the best of your recollection, talk to me about when you go down Colfax in front of the Basilica, between Logan and Pennsylvania.  What do you recall was occurring there?
>
> A.  I was with my two friends[13] and a pretty large group, a reasonable-sized group of protesters.  We were marching to the east on Colfax.  And I remember seeing a line of police officers in front of us.  We were probably chanting, holding signs and the like.  And then I remember, like, hearing -- hearing sounds, like banging sounds from behind us.  And the group kind of, you know, turned around and realized there were police officers that had essentially trapped us on this section of Colfax.  And that's when we realized that they had, I believe, tear-gassed us, because everybody started coughing and kind of stumbling around and didn't know where to go because the two obvious exits were blocked by police.

---

[12] To be as clear as possible, the Court notes that several Plaintiffs also assert their Fourth Amendment claims based on the use of physical force against their bodies.  *See, e.g.*, [Doc. 133 at ¶¶ 161, 181, 303, 315, 340, 411].  Defendant does not argue that this use of force did not constitute a Fourth Amendment seizure or seek summary judgment in its favor on this basis.  *See* [Doc. 212 at 17].

[13] Plaintiff Smedberg appears to be referencing Plaintiffs Cousik and Zinman.  *See* [Doc. 198-13 at 35:14–20].

[Doc. 198-13 at 39:19–40:14 (footnote added)]; *see also* [*id.* at 59:19–22 (Plaintiff Smedberg explaining that after tear gas was discharged, "the whole crowd [was] funneled into that small alleyway on the south side of Colfax")].

A seizure occurs where there is a "governmental termination of freedom of movement through means intentionally applied." *Brower*, 489 U.S. at 597 (emphasis omitted). A person can still be seized even if they are not completely immobilized: "what is required is that a person's freedom of movement had been terminated, not that the person's movement itself had been terminated." *Alsaada*, 536 F. Supp. 3d at 264. Plaintiffs have adduced evidence from which a reasonable jury could find that Defendant's officers restricted the freedom of movement of Plaintiffs Cousik, Smedberg, and Zinman by "trapp[ing]" them on Colfax in the course of deploying tear gas or another chemical agent.[14] *Cf. Downes-Covington v. Las Vegas Metro. Police Dep't*, No. 2:20-cv-01790-GMN-DJA, 2020 WL 7408725, at *10 (D. Nev. Dec. 17, 2020) (finding likelihood of success on Fourth Amendment claim even where the plaintiffs "were not directly hit by pepperballs or tear gas" but where police corralled and blocked protestors); *Marbet v. City of Portland*, No. 3:02-cv-01448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) (denying motion to dismiss Fourth Amendment claim where policy "physically moved the protestors approximately 120 feet" using pepper spray and physical force). Accordingly, the Motion for Summary Judgment is **DENIED** to the extent it seeks judgment on this

---

[14] The Court notes that, in Plaintiff Cousik's deposition, he stated that these Plaintiffs "escaped through a narrow alley right nearby." [Doc. 198-12 at 62:5–63:2]. This statement does not change the Court's ruling, as the Court must construe all evidence in favor of Plaintiffs and does not weigh evidence or judge credibility. *See Fogarty*, 523 F.3d at 1165.

portion of the Fourth Amendment claims asserted by Plaintiffs Smedberg, Zinman, or Cousik.

Finally, turning to Plaintiffs Wood and Douglas, Plaintiffs assert that, on May 31, 2020, "[t]hey were marching on Colfax when suddenly there were lines of officers in front and behind them, who gassed them from both sides." [Doc. 197 at 9, ¶ 18]. To be sure, the evidence cited by Plaintiffs does suggest that Denver officers restrained the freedom of movement of Plaintiff Wood and Plaintiff Douglas on May 31. *See* [Doc. 198-16 at 75:25–76:1, 76:22–23, 76:24–77:1, 77:10–21, 87:14–17 (Plaintiff Wood explaining at her deposition how she and Plaintiff Douglas were surrounded by police officers in front and behind, tear gas was deployed "from both directions," and that they could not disperse)]; *see also* [Doc. 198-66 at 4; Doc. 198-67 at 4]. But notably, Defendant challenges only Wood's and Douglas's Fourth Amendment claims to the extent they are based on the disbursement of tear gas on May 30, 2020. *See* [Doc. 175 at 13; Doc. 133 at ¶¶ 192–93]. Plaintiffs have not directed the Court to any evidence that Plaintiff Wood or Plaintiff Douglas had their freedom of movement terminated or restrained by the deployment of tear gas on May 30, 2020. *See generally* [Doc. 197]. Accordingly, to the extent Plaintiffs Wood and Douglas assert a Fourth Amendment claim based on the deployment of tear gas on May 30, 2020, they have not adduced sufficient evidence from which a jury could conclude that their freedom of movement was terminated, such that they were subject to a Fourth Amendment seizure on that date. Accordingly, the Motion for Summary Judgment is **GRANTED** to the limited extent that Plaintiffs Wood and Douglas bring Fourth Amendment claims based on an alleged seizure due to the deployment of tear gas on May 30, 2020.

IV.     **Municipal Policy or Custom**

In the alternative, Denver argues that Plaintiffs cannot demonstrate the existence of a municipal policy or custom that was the driving force behind their injuries, which is required to hold Denver liable.  [Doc. 175 at 13].  The Court's analysis is limited to the remaining First and Fourth Amendment claims.  The Parties' arguments do not distinguish between Plaintiffs' different constitutional claims, *see* [*id.* at 13–20; Doc. 197 at 20–25], and the Court follows suit.

"[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).  Government entities can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  It is the plaintiff's burden to identify a municipal custom or policy that caused the plaintiff's injuries.  *Brown*, 520 U.S. at 403.

To succeed on a municipal liability claim, a plaintiff must prove that "(1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring."  *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs*,

32 F.4th 1246, 1253 (10th Cir. 2022).[15]  An official policy or custom under *Monell* may take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

But it is not enough for a plaintiff to simply identify a municipal policy or custom— the plaintiff must also "demonstrate a direct causal link between the municipal action and

---

[15] The Parties set forth opposing arguments with respect to the requisite elements of a *Monell* claim.  Defendant argues that, to succeed on their *Monell* claims, Plaintiffs must establish that the municipal practices were carried out with deliberate indifference to known or obvious consequences.  [Doc. 175 at 14].  Plaintiffs disagree; they insist that a showing of deliberate indifference is required only where a *Monell* claim is based on an alleged failure to train or failure to supervise.  [Doc. 197 at 21–22].  At least two courts in this District have come to opposing conclusions on this question.  *Compare Epps*, 588 F. Supp. 3d at 1175 n.4 ("Deliberate indifference is required only for municipal liability based upon a failure to adequately train or supervise.  Other claims require only the existence of a policy and causation." (citations omitted)), *with Dennis v. City & Cnty. of Denver*, No. 22-cv-00608-WJM-KAS, 2023 WL 5864117, at *4 (D. Colo. Sept. 11, 2023) (deciding that a plaintiff must show that the municipality "acted with deliberate indifference regardless of which theory of liability she asserts" (emphasis omitted)).  While the Court does not find Plaintiffs' view of the law unreasonable, the Court notes that the Tenth Circuit cases Plaintiffs rely upon do not decisively hold that deliberate indifference is not required for certain theories of municipal liability.  *See, e.g.*, *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  Moreover, the Tenth Circuit has recently included the deliberate-indifference element when reciting the elements of *Monell* liability even in cases where the plaintiff did not rely on a failure-to-train or failure-to-supervise theory.  *See, e.g.*, *Lucas*, 58 F.4th at 1145; *see also Arnold v. City of Olathe*, 35 F.4th 778, 795 (10th Cir. 2022); *Lance v. Morris*, 985 F.3d 787, 803–04 (10th Cir. 2021).  The Court is bound by this precedent.

the deprivation of federal rights." *Brown*, 520 U.S. at 404. This means that "the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quotation omitted). This threshold is met if the plaintiff shows that the municipality was the "moving force" behind the alleged injury. *Id.* (quoting *Brown*, 520 U.S. at 404).

Finally, the plaintiff must demonstrate that the challenged policy was enacted with deliberate indifference. A plaintiff may show deliberate indifference by adducing evidence that the municipality had actual or constructive notice that its action (or its failure to act) was substantially certain to result in a constitutional violation and that the municipality consciously and deliberately chose to disregard that risk. *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022). A municipality may be on notice through a pattern of tortious conduct or "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998)). The requirements of *Monell* must be applied rigorously to avoid collapsing municipal liability into respondeat superior liability. *Schneider*, 717 F.3d at 772.

The Parties' arguments with respect to Plaintiffs' *Monell* claims are somewhat difficult to square. Denver identifies seven different potential types of policies that could form the bases of Plaintiffs' *Monell* claims—(1) an informal, widespread custom or policy; (2) decisions of a final policymaker; (3) failure to discipline; (4) a policy of not requiring officers to deploy body worn cameras ("BWC"); (5) a policy of not requiring officers to file use-of-force reports; (6) ratification; and (7) failure to train—and argues that Plaintiffs

cannot succeed on any theory for various reasons.  [Doc. 175 at 13–20].  Plaintiffs do not directly respond to each of Defendant's arguments specifically, instead making collective arguments about how they can satisfy each of the required *Monell* elements—municipal policy, causation, and deliberate indifference.  [Doc. 197 at 20–25].  The Court addresses each theory of a potential municipal policy below.

### A.     Informal Policy or Custom[16]

"[A] custom is a practice that is so 'continuing, persistent, and widespread' that it has the force of law.'"  *Jensen v. W. Jordan City*, 968 F.3d 1187, 1204 (10th Cir. 2020) (quotation omitted); *see also Bryson*, 627 F.3d at 788 (an unofficial policy or custom must be "so permanent and well settled as to constitute a custom or usage with the force of law"  (quotation omitted)).  Defendant argues that Plaintiffs cannot adduce evidence of a persistent and widespread informal custom because their evidence "is based solely and exclusively on" a six-day span of events during the protests, maintaining that Plaintiffs must show more than "simply what occurred during the same multi-day event."  [Doc. 175 at 16].

Plaintiffs respond by asserting that expert reports issued by Edward Maguire and Norman Stamper "identify and provide extensive evidentiary support for the following non-exhaustive list of [Denver] policies or practices that underlie Plaintiff[s'] claims," including:

> failure to give orders before the use of force, indiscriminate and inappropriate use of munitions and PepperBalls, and inadequate training

---

[16] Defendant notes that Plaintiffs do not identify any specific official Denver policy as forming the basis of their claims and instead primarily base their claims on alleged informal practices or customs.  [Doc. 175 at 16].  Although Plaintiffs argue elsewhere that they need not show deliberate indifference with respect to "any of the official policies," [Doc. 197 at 21], Plaintiffs do not identify any specific official Denver policies that they claim caused their injuries, *see* [*id.* at 20–22].  Thus, the Court assumes that Plaintiffs do not proceed on a theory of an official Denver policy statement.

> thereon; failure to require officers to complete timely use-of-force reports, which negatively impacted officer accountability; a policy of not requiring BWC activation during protests and failure to train thereon; failure to discipline officers for the excessive use of force; and indiscriminate use of tear gas ordered by a[n] undisputed final policymaker, Commander Phelan.

[Doc. 197 at 20 (citing Doc. 197 at 3–4, ¶¶ 16–20 and at 11–15, ¶¶ 33–51)].  Plaintiffs do not clearly explain which theories they believe amount to an informal custom or direct the Court to any specific evidence supporting any particular unofficial custom, but instead cite generally to 24 separate assertions of fact contained elsewhere in their Response.  [*Id.*].[17] Stated differently, instead of citing clearly and directly to *specific* record evidence and explaining why this evidence supports their various theories of relief, Plaintiffs ask this Court to independently review the 24 assertions of fact cited by Plaintiffs in support of their list of purported policies; locate the relevant citations to the expert reports contained therein; review the respective 91-page and 18-page reports (perhaps limiting its focus to the dozens of paragraphs cited in the above-mentioned 24 assertions of fact); and independently ascertain—with no argument from Plaintiffs—which paragraphs contained in the expert reports demonstrate the existence of each of the numerous purported unofficial policies or customs listed by Plaintiffs.  But it is not the Court's duty to comb through the voluminous record to find support for Plaintiffs' various potential theories of relief or to construct arguments on behalf of Plaintiffs that they could have, but did not, raise themselves.  *N.M. Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795,

---

[17] Underscoring Plaintiffs' failure to make Plaintiff-specific arguments supported by Plaintiff-specific evidence, significant portions of Plaintiffs' brief are copied and pasted from a brief filed in opposition to Denver's summary judgment motion in *Epps*.  *Compare* [Doc. 197], with *Epps v. City & Cnty. of Denver*, 20-cv-01878-RBJ, ECF No. 286 (D. Colo. Feb. 11, 2022).  But as discussed above, this Court is not bound by the *Epps* court's determinations with respect to summary judgment.  *See supra* n.1.

803 (10th Cir. 2016); *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008) ("[R]eading a record should not be like a game of Where's Waldo?"); Fed. R. Civ. P. 56(e)(2).

Moreover, Plaintiffs fail to raise any clear argument in response to Defendant's contention that Plaintiffs cannot provide evidence of an informal custom that is continuing, persistent, and widespread.  *See* [Doc. 175 at 16–17; Doc. 197 at 20–21].  Nor do they direct the Court to any evidence supporting such a theory; a general reference to two expert reports, without specific references to the statements therein and without specific arguments explaining which evidence demonstrates which purported unofficial custom, does not suffice.  [Doc. 197 at 20–21].  And it is not this Court's role to independently review the voluminous record to ascertain whether such evidence exists.  *See Certain Underwriters At Lloyd's London v. Garmin Int'l, Inc.*, 781 F.3d 1226, 1231 (10th Cir. 2015) (finding no abuse of discretion where the district court "refus[ed] to sift through the voluminous exhibits in order to match the assertions in [the defendant's] motions to his supporting documentation").

Nevertheless, the Court notes that at least some of the purported policies identified by Plaintiffs do not fit neatly within the "informal custom" box; for example, Plaintiffs' suggestions about failures to train or decisions of a final policymaker are clearly theories that are separate and distinct from a widespread, informal custom.  Moreover, while Defendant claims that Plaintiffs' custom evidence "is based solely and exclusively on the response to the protests in May and June 2020," [Doc. 175 at 16], and although it is not this Court's duty to piece together Plaintiffs' arguments, the Court notes that Plaintiffs suggest that Denver's purported policies of not requiring officers to deploy their BWC or

write use-of-force reports was "understood *before and during* the protests," *see* [Doc. 197 at 23 (emphasis added)], such that the Court is not prepared to dispense of Plaintiffs' claims based on those theories.[18]  But in all other respects, insofar as Plaintiffs' *Monell* claims are based on any other informal custom or policy (e.g., any failure to give orders before the use of force or indiscriminate and inappropriate use of munitions or PepperBalls), because they have not directed the Court to specific evidence in the record demonstrating the existence of a widespread, persistent, and continuing unofficial custom, they have not established a genuine dispute of fact sufficient to preclude summary judgment on these *Monell* theories.  *See Finch*, 38 F.4th at 1245 n.2 (explaining that a plaintiff "must provide evidence of a pattern of relevant conduct" and further suggesting that this may turn on whether other relevant conduct includes similar facts or amounts to a "common theme or pattern" (emphasis omitted)).  Plaintiffs cannot proceed on any such theory.  *See Epps v. City & Cnty. of Denver*, No. 20-cv-01878-RBJ, 2022 WL 21727363, at *8 (D. Colo. Sept. 23, 2022) (granting summary judgment in the defendant's favor on ratification theory where the plaintiffs did not respond to the defendant's argument and did not present evidence of ratification), *aff'd sub nom. Packard v. Budaj*, 86 F.4th 859 (10th Cir. 2023).

## B.    Decisions of a Final Policymaker

Next, Defendant argues that to the extent that Plaintiffs assert *Monell* claims based on decisions of a final policymaker, their claims fail for lack of causation.  [Doc. 175 at 17].  It asserts that "Plaintiffs must present specific evidence establishing Commander Phelan . . . somehow individually and personally participated in each of the specific events

---

[18] These theories are discussed below.

presented at trial" and must "establish causation between the actions of Commander Phelan and the specific and individual officer decisions to deploy less-lethal munitions in a manner impacting Plaintiffs." [*Id.*].  Defendant contends that Plaintiffs cannot meet this burden.  [*Id.*].

Plaintiffs respond that "there is plenty of evidence that [Commander Phelan] directly participated and caused the injuries to Plaintiffs," citing generally to paragraph 20 of their Response to Statement of Material Facts.  [Doc. 197 at 23].  Plaintiffs rely on two specific assertions:  first, that Commander Phelan directed the kettling at the Basilica on May 31, 2020, and second, that Commander Phelan authorized the use of gas "on numerous occasions."  [*Id.*].  However, the Court notes that the only occasions of authorizing gas mentioned by Plaintiffs in the Response are (1) the authorization of gas on May 28, 2020 at the intersections of 14th and Sherman and Colfax and Lincoln, [*id.* at 14, ¶ 47], and (2) the authorization of gas "and other 'less-lethal' weapons" on May 30, 2020 at the intersection of Lincoln and Colfax, [*id.* at 14, ¶ 48].  Plaintiffs conclude that "[a] reasonable jury could conclude that [Commander Phelan's] actions caused the injuries to Plaintiffs."  [*Id.* at 23].  Again, Plaintiffs' argument addresses the thirteen Plaintiffs and their remaining claims as a collective whole, rather than directing the Court to specific arguments or evidence supporting each Plaintiff's claims.

While causation is generally a question of fact reserved for the jury, the question whether the plaintiff has adduced sufficient evidence of causation to defeat a summary judgment motion is a question of law for the Court.  *Schneider*, 717 F.3d at 778.  The Court turns to this determination, limiting its analysis to the specific incidents identified by Plaintiffs above.

*Approving Kettling at the Basilica on May 31, 2020.*  Plaintiffs assert that Commander Phelan approved the kettling at the Basilica on May 31, 2020.  [Doc. 197 at 23; *id.* at 12, ¶ 38].  This assertion is supported in the cited evidence.  *See, e.g.*, [Doc. 198-54 at 77:14–78:15; Doc. 198-36 at ¶ 124].

As mentioned above, Plaintiffs do not raise any claimant-specific arguments explaining why this conduct caused any of the Plaintiffs' specific injuries, instead simply asserting that a jury "could conclude that [Commander Phelan's] actions caused the injuries to Plaintiffs."  *See* [Doc. 197 at 23].  In fact, throughout their Response, Plaintiffs only assert that five of the thirteen Plaintiffs were kettled at the Basilica on May 31, 2020—Plaintiffs Zinman, Cousik, Smedberg, Wood, and Douglas.  *See* [*id.* at 8–9, ¶¶ 15, 18].  The Court notes that while these five Plaintiffs allege that they were kettled, they also allege that they were injured by another type of force—such as tear gas or a projectile, *see, e.g.*, [*id.* at 8, ¶ 16 ("During this kettling, Zinman, Smedberg, and Cousik were coughing, disoriented, and  panicked.  They were gassed and funneled into a very small alleyway." (citations omitted)); *id.* at 9, ¶ 18 ("Wood and Douglas were also kettled during this incident at the Basilica on May 31.  They were marching on Colfax when suddenly there were lines of officers in front and behind them, who gassed them from both sides. Wood was shot several times with PepperBalls while trying to climb the wrought iron fence to escape." (citations omitted))], which may raise the question of whether it is Commander Phelan's decision to kettle the protestors that was the "moving force" behind their injuries, or whether it was something else (i.e., the actual use of gas or projectiles).  But this is a question for the jury, not the Court, to decide.  *See Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) ("The requisite causal connection is satisfied if the defendant set in

motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." (quotation omitted)).  Accordingly, insofar as Plaintiffs' *Monell* claims are based on a theory that the decision of final policymaker Phelan to kettle protestors on May 31, 2020 caused injuries to Plaintiffs Zinman, Cousik, Smedberg, Wood, and Douglas, these Plaintiffs have identified a genuine dispute of fact sufficient to survive summary judgment on this basis.

***Authorizing the Use of Gas on May 28, 2020 at 14th and Sherman.***  Next, Plaintiffs contend that Commander Phelan authorized the use of gas "on several occasions, including May 28, 2020 at 14th and Sherman."   [Doc. 197 at 14, ¶ 47]. However, the Court has reviewed the evidence cited by Plaintiffs in support of this assertion and concludes that it is not evidence from which a reasonable jury could find that Commander Phelan authorized the use of gas at that intersection on that date.  *See, e.g.*, [Doc. 198-36 at ¶ 104 (Edward Maguire stating that "[t]here were several occasions, such as on May 28, when Commander Phelan himself authorized the use of tear gas to disperse crowds, without any assessment of whether the crowd was mostly peaceful with a few aggressors and without any attempt to isolate the aggressors," specifically mentioning the intersections of Colfax and Washington and Colfax and Lincoln, but not mentioning 14th and Sherman)].  The Court notes that Exhibit 89 contains video footage from 14th and Sherman that Plaintiffs claim is from May 28, 2020,[19] *see, e.g.*, [Doc. 198-

---

[19] Plaintiffs claim that this video was recorded May 28, 2020.  *See, e.g.*, [Doc. 197 at 14, ¶ 47].  The Court notes, however, that the date stamp on the video states May 29, 2020. *See generally* [Doc. 198-89].  It is not clear to the Court whether the video depicts events occurring after 12:00 A.M. on May 29, 2020 or whether the date stamp is in error, but the Court assumes for purposes of this argument that the video depicts events occurring on May 28, 2020.

89 at 03:01:42–3:03:58], but it is not clear from the portion of the video cited by Plaintiffs that Commander Phelan authorized the use of gas at that intersection that night.  To the extent there exists such evidence elsewhere in the record, it is not this Court's duty to find it.  *Aquila, Inc.*, 545 F.3d at 1268.

*Authorizing the Use of Gas on May 28, 2020 at Colfax and Lincoln.*  Plaintiffs also contend that Commander Phelan authorized the use of gas on May 28, 2020 at Colfax and Lincoln.  [Doc. 197 at 14, ¶ 47].  This assertion is supported by cited evidence. *See* [Doc. 198-36 at ¶ 104].

Plaintiffs do not make any Plaintiff-specific arguments explaining why this caused their injuries.  *See* [Doc. 197 at 23].  While it is not the Court's duty to construct arguments on Plaintiffs' behalf, *N.M. Off-Highway Vehicle All.*, 645 F. App'x at 803, elsewhere in their Response, Plaintiffs assert that two Plaintiffs—Gonzalez and Williams—were injured by tear gas at undisclosed locations on May 28, 2020, [Doc. 197 at 6, ¶ 4; *id.* at 10, ¶ 26]. The Court has reviewed the evidence cited by Plaintiffs and concludes that, *based on the evidence cited by Plaintiffs*, no reasonable jury could conclude that Plaintiff Gonzalez was injured by Commander Phelan's authorization of tear gas at Colfax and Lincoln on May 28, 2020.  Plaintiffs direct the Court to evidence that Plaintiff Gonzalez was injured on May 28, 2020 by PepperBalls on I-25 and at 16th and Platte, but this evidence does not show that he was gassed at Colfax and Lincoln.  *See* [Doc. 198-63 at 3–4].  And at his deposition, Plaintiff Gonzalez stated that he was targeted with pepper spray at Colfax and Lincoln, but there is no indication in the deposition testimony that this occurred on May 28, 2020.  *See* [Doc. 198-6 at 95:1–14].  Thus, Plaintiffs have not directed the Court to any evidence from which a reasonable jury could conclude that Commander Phelan's

alleged authorization of tear gas at Colfax and Lincoln on May 28, 2020 caused Plaintiff Gonzalez's injuries.

As for Plaintiff Williams, Plaintiffs cite evidence that on May 28, 2020, at one point, "he was standing on Colfax in front of the north side of the Capitol," at which time Denver officers "unleashed tear gas and flashbang grenades or other explosive devices."  [Doc. 198-70 at 3].  He also stated in his deposition that at "[a]bout 10:00 p.m. [on May 28, 2020], [he] inhaled tear gas on Colfax and Lincoln."  [Doc. 198-28 at 99:9–13]; *see also* [*id.* at 100:23–101:14].  This is sufficient to create a genuine dispute of material fact as to whether Commander Phelan's authorization caused this alleged injury.  Accordingly, while Plaintiffs have not demonstrated a genuine issue of material fact or cited evidence from which a reasonable jury could conclude that Commander Phelan's authorization of tear gas at Colfax and Lincoln caused Plaintiff Gonzalez's injuries, they have done so with respect to Plaintiff Williams, but only insofar as he alleges he was subject to tear gas at the intersection of Colfax and Lincoln on May 28, 2020.

***Authorizing the Use of Gas and Other Less-Lethal Weapons on May 30, 2020 at Colfax and Lincoln.***  Finally, Plaintiffs contend that Commander Phelan authorized the use of gas and other "less-lethal" weapons at the intersection of Lincoln and Colfax on May 30, 2020, which they contend supports a finding that a municipal policy or custom caused Plaintiffs' injuries.  [Doc. 197 at 14, ¶ 48].  In support, Plaintiffs cite only one exhibit—a deposition of Stephen Redfearn, who is not identified by Plaintiffs or in the cited transcript pages, which was taken in a separate litigation.  *See* [Doc. 198-61].  The cited testimony is as follows:

> [A.]  that went into deploying gas or didn't go into deploying gas because I wasn't in the command post when those decisions were being made.

Q.  Okay.  And the command post was telling you when to deploy gas when you were at the intersection of Lincoln and Colfax on May 30th, correct?

A.  Not me specifically.  I was told on more than one occasion, a Denver supervisor would say, "Hey, okay, in a minute, we're going to -- we're going to get ready to push south.  We're going to go, you know, take some section of this roadway, and -- and when we do that, if people don't leave, we're going to deploy gas," so I -- some of those directions were coming from, I guess, third hand to us from the command post.

Q.  Okay.  But it was coming down from command post to a Denver supervisor, and then to you, right?

. . .

A.  Some of the time.  There might have been other times when officers deployed gas because they saw something that they needed to immediately address.  I can't speak for every instance that it was deployed.

Q.  Was all the use of force that you witnessed at the intersection of Lincoln and Colfax between 6:00 and 8:00 p.m. in accordance with Aurora policies and procedures?

[Doc. 198-61 at 55:1–25].  But Plaintiffs never cite any evidence supporting their assertion that the tear gas was "authorized by Phelan from the Command Post," *see* [Doc. 197 at 14, ¶ 48], and the cited deposition testimony does not clearly demonstrate that Commander Phelan authorized the use of tear gas on Colfax and Lincoln on May 30, 2020, *see* [Doc. 198-61 at 55:1–25].  To the extent such evidence exists elsewhere in the record, it is not this Court's duty to locate it.  *Aquila, Inc.*, 545 F.3d at 1268.  Accordingly, Plaintiffs have not demonstrated a genuine dispute of material fact with respect to this theory.

In sum, Plaintiffs Zinman, Cousik, Smedberg, Wood, and Douglas may proceed with a *Monell* theory based on Commander Phelan's decision to authorize kettling at the Basilica on May 31, 2020, and Plaintiff Williams may proceed with a *Monell* theory based

on Commander Phelan's decision to authorize tear gas at the intersection of Colfax and Lincoln on May 28, 2020.  But because Plaintiffs fail to direct the Court to evidence supporting any other *Monell* claim based on decisions of Commander Phelan that are sufficient to create a genuine dispute of fact, Defendant is entitled to summary judgment on any remaining portions of Plaintiffs' claims based on the decisions of Commander Phelan, and Plaintiffs may not rely on any other final decisionmaker theory at trial.

C.   **Failure to Discipline**

Defendant next challenges Plaintiffs' *Monell* claims insofar as they are based on a failure-to-discipline theory, a theory which Defendant contends has been "rejected by the Tenth Circuit" as well as other courts in the Tenth Circuit.  [Doc. 175 at 17].  Plaintiffs do not respond to this argument.  They instead assert that "[t]here is . . . a genuine dispute of fact with respect to failure to discipline and ratification" and state that "Denver's failure to discipline officers . . . constitutes ratification of their conduct, which is another way to establish policy."  [Doc. 197 at 24].  But the Tenth Circuit has instructed that "[f]ailing to adequately . . . punish does not count as ratification."  *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774, 787 (10th Cir. 2019); *see also Huff v. City of Aurora*, No. 21-cv-02715-RMR-NRN, 2022 WL 4131438, at *12 (D. Colo. Sept. 12, 2022) ("Generally, the final decisionmakers' approval must precede the violative action; the Tenth Circuit has rejected ratification based on a failure to discipline after the violation has occurred.").  Accordingly, Plaintiffs cannot succeed on a ratification theory based on a failure to discipline.  Furthermore, to the extent Plaintiffs suggest that a prior failure to discipline caused officers to act unconstitutionally, although Plaintiffs contend that "[w]hen officers confronted protestors, they did so knowing that existing DPD policy or custom

was not to punish officers for constitutional violations," [Doc. 197 at 24 (emphasis omitted)], and that "DPD's policy of impunity was a direct cause of Plaintiffs' injuries," [*id.* at 25], these assertions are not supported by any citation to record evidence or legal authority, *see* [*id.* at 24–25].[20]  Thus, even though the Tenth Circuit has stated that "[a] failure to . . . reprimand might . . . cause a future violation by sending a message to officers that such behavior is tolerated," *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009), Plaintiffs have not directed the Court to any evidence or argument supporting such a theory sufficient to create a genuine issue of material fact, and so they cannot proceed on this theory, *Epps*, 2022 WL 21727363, at *8.

### D.     Failure to Deploy Body Worn Cameras

Defendant contends that Plaintiffs' *Monell* claims fail to the extent that they assert that an unofficial policy of a failure to deploy body worn cameras caused their injuries. [Doc. 175 at 18].  Defendant asserts that this theory "fails because whether an officer uses her camera does not establish whether the underlying event violated anyone's constitutional rights."  [*Id.*].  Defendant also asserts that this theory "fail[s] the basic principle of linear time," suggesting that actions that occurred after the alleged constitutional violation could not have caused the constitutional violation.  [*Id.* at 18 n.1]. Plaintiffs respond that "each excessive use of force was made more likely to occur by

---

[20] Elsewhere in their Response, Plaintiffs assert that "[o]fficers knew they would not be disciplined." [Doc. 197 at 3, ¶ 16].  But the evidence cited in support of this undeveloped assertion—deposition testimony from a Sergeant Martinez, who stated that "based on what [he] saw" on May 30, 2020, he did "not see the need for anybody to be disciplined," *see* [Doc. 198-44 at 93:8–14]—does not support an inference that *all* of the (unidentified) Denver police officers who used force on the Plaintiffs in May 2020 had the impression that they would not be disciplined for the use of force and acted based on that impression, so as to demonstrate "a direct causal link between the municipal action and the deprivation of federal rights," *Brown*, 520 U.S. at 404.

DPD's policies and practices that eschewed officer accountability, including . . . officers' failure to activate BWC."   [Doc. 197 at 23].   They assert that "Denver'[s] policy of not requiring . . . activation of BWC—a policy that officers understood before and during the protests—minimized the likelihood that officers would be held accountable for their use of force, which in turn led to excessive force and Plaintiffs' injuries."   [*Id.*].

Defendant's first argument is difficult to understand and does not clearly challenge any of the three *Monell* elements.[21]   Plaintiffs do not appear to contend that the alleged failure to deploy BWC amounted to a constitutional violation in this case.   This argument, and Defendant's later argument that this theory fails because the officers' failure to deploy BWC during the use of force could not have caused any constitutional violation occurring during that use of force, *see* [*id.* at 18 n.1], misses the mark on Plaintiffs' theory of relief. Plaintiffs contend that an unofficial policy—that predated the events giving rise to this case—of not requiring police officers to activate their BWC caused their injuries because the officers using force in this case felt comfortable doing so.   *See* [*id.* at 23].   Plaintiffs have cited evidence in support of this theory.   *See* [Doc. 198-36 at ¶ 166 ("[W]ithout complete BWC video of their actions during the protests, officers could (and apparently did) use inappropriate force on protestors with impunity. . . .   Defendant Officers knew that they would not be held to account for their actions through . . . their BWC[.]   *DPD's*

---

[21] In its Reply, Denver asserts that Plaintiffs cannot demonstrate deliberate indifference in the implementation of such a policy because "no evidence exists of any awareness by any DPD leader how BWC was activated or used prior to the protests posed any problem related to using inappropriate force."   [Doc. 212 at 19].   Defendant could have raised a clear argument challenging the deliberate indifference prong in its affirmative Motion and did not do so. *See generally* [Doc. 175].   The Court declines to address this new argument raised for the first time in Defendant's Reply.   *See Vaughn v. Epworth Villa*, 537 F.3d 1147, 1153 n.5 (10th Cir. 2008).

*policy and practice caused in significant part the violation of the constitutional rights of Plaintiffs*."   (emphasis added))]; *see also* [*id.* at ¶ 198 ("The DPD's failure to require officers to activate their BWC during protests represents a serious management failure that once again appears engineered to help officers avoid accountability for their actions during the protests.")].   The Court cannot and does not weigh this evidence, but simply finds that Plaintiffs have identified a genuine dispute of fact with respect to this theory of relief.

### E.     Failure to Require Use-of-Force Reports

Defendant next argues that Plaintiffs' *Monell* claims based on an alleged failure to require officers to file use-of-force reports fail because "whether any officer wrote a report after a use of force does not establish anything about the underlying events or whether a constitutional violation occurred."  [Doc. 175 at 18].  Defendant continues that this theory "fail[s] the basic principle of linear time" because an action that occurred after an alleged constitutional violation—i.e., the alleged failure to write a use-of-force report—could not have caused the constitutional injury.  [*Id.* at 18 n.1].

For the reasons discussed above, Defendant's arguments are unpersuasive. Plaintiffs' theory is that Denver's purported policy of not requiring its offers to write use-of-force reports during protests caused the officers to feel more comfortable using force on protestors and, in turn, caused Plaintiffs' injuries.  *See* [Doc. 197 at 23].  The Maguire report provides some support for this theory.  *See* [Doc. 198-36 at ¶ 166].  Defendant has not demonstrated that it is entitled to summary judgment on this theory.

F.      Ratification

In addition, Defendant asserts that to the extent Plaintiffs rely on a ratification theory, their claims fail because there is no evidence that any Denver final policymaker authorized any of the specific actions of officers related to Plaintiffs or the basis of those actions.  [Doc. 175 at 18–19].  Plaintiffs respond that "[f]inal policymakers praised officers' use of force which led to officers to continue using excessive force."   [Doc. 197 at 25]. They also suggest that "Denver's cited cases . . . are inapposite," [*id.*], but fail to develop this assertion and cite no legal authority in support, *see* [*id.*].

To succeed on a ratification theory, the plaintiff must show that a final decisionmaker has ratified the employee's specific unconstitutional actions *and* the basis for those actions.  *Bryson*, 627 F.3d at 790.  Plaintiffs' contention that final policymakers ratified officer conduct, which led to officers continuing to use excessive force, relies on evidence that on May 29, 2020, Denver's then-mayor and a Chief Pazen conducted a press conference, at which they stated that Denver officers acted with "extreme restraint," performed in an "exemplary manner," and showed "tremendous restraint" and "discipline." [Doc. 197 at 14–15, ¶ 50; *id.* at 25]; *see also* [Doc. 198-92 at 12:20–30, 37:40–50; Doc. 198-91 at 34:1–5].  Plaintiffs' argument that these comments demonstrate ratification is not supported by legal authority.  [Doc. 197 at 25].

But as pointed out by Defendant, *see* [Doc. 184 at 19; Doc. 212 at 19], Plaintiffs direct the Court to no evidence from which a reasonable jury could find that the mayor or Chief Pazen ratified the *specific* conduct challenged here and the *specific* bases for that conduct.  Indeed, the press conference comments do not clearly condone the specific conduct challenged here—kettling protestors, using chemical agents on protestors, or

using less-lethal munitions on protestors.  The generalized comments commending the *entirety* of *all* police officers' conduct the night before is insufficient to support a ratification theory.  *See Bidwell v. Cnty. of San Diego*, 607 F. Supp. 3d 1084, 1104 (S.D. Cal. 2022) (evidence that police chief and sheriff praised officers and deputies and issued statements that they were "proud of" the employees "[did] not suggest, . . . that this type of action constitutes ratification of all decisions by subordinates . . . so that the decisions become policy under *Monell*"), *aff'd*, No. 22-55680, 2023 WL 7381462 (9th Cir. Nov. 8, 2023).  "[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's *specific unconstitutional actions*, *as well as the basis for these actions*."  *Bryson*, 627 F.3d at 790 (emphasis added)).

Plaintiffs further contend that "[a] reasonable jury could find in Plaintiffs' favor on their ratification theory" because "the jury in *Epps* already did on the exact same evidence."  [Doc. 197 at 24].  This assertion insufficient to preclude summary judgment. It is Plaintiffs' burden to present evidence to *this Court* to create a genuine issue of fact for the jury.  The fact that a jury found in the plaintiffs' favor in a similar but separate civil action does not provide Plaintiffs in this case a free ticket to trial.

### G.    Failure to Train

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional

violation, than was the policy in *Monell*.").   "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983."  *City of Canton*, 489 U.S. at 389.

Defendant contends that to the extent Plaintiffs' claims are based on an alleged failure to train, Plaintiffs cannot adduce any evidence showing that any Denver final policymaker had knowledge of any training deficiencies.  [Doc. 175 at 19].  According to Denver, "[i]t is not enough for Plaintiffs to offer evidence of training deficiencies in the abstract, absent knowledge by a Denver final policymaker, and a causal connection between the training deficiency and the alleged violations."  [*Id.* at 19 n.2].  Denver also posits that the 2020 protests were "unprecedented" and, for this reason, Denver and its police department "did not have any prior notice of any training deficiencies."  [*Id.* at 20].

Plaintiffs' Response primarily focuses on Defendant's last assertion—that the 2020 protests were "unprecedented."  [Doc. 197 at 24].  They contend that whether Denver could have anticipated the circumstances its officers would confront "is a quintessential fact question, and a highly disputed one," noting other protests that have occurred in Denver and across the country.  [*Id.*].  Plaintiffs also assert that "Denver understood that its failure to train officers for these circumstances could result in depriving protestors of their constitutional rights," [*id.*], citing generally to the entirety of the Maguire and Stamper expert reports and various assertions of fact in their brief, as well as to two passages in the Stamper report opining that the Denver Police Department generally was unprepared for the protests, that it "should have been much better prepared" for the protests, that it "should have been prepared for what it faced" during the protests, and that "[h]aving adequate policies and training in crowd control and crowd management is fundamental

to the work of police departments," [Doc. 198-49 at ¶¶ 36–37].  Plaintiffs conclude that a reasonable jury could find that the DPD's "decision to deemphasize training reflects deliberate indifference."  [Doc. 197 at 24].

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quotation omitted).  This is typically demonstrated by "proving the existence of a pattern of tortious conduct."  *Id.* (quotation omitted).  Only in a "narrow range of circumstances" will deliberate indifference be found without a pattern of unconstitutional behavior—such as when "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction."  *Id.* (cleaned up).

Plaintiffs do not argue that this case falls within the narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of the government's actions or inactions.  *See* [Doc. 197 at 24].  The Court thus assumes that Plaintiffs proceed on a theory that Denver had actual or constructive notice of the alleged training deficiencies.  *See* [*id.* ("*Denver understood* that its failure to train officers . . . could result in depriving protestors of their constitutional rights." (emphasis added))].

Thus, to show deliberate indifference on the part of Denver, Plaintiffs must adduce evidence of a pattern of untrained employees' constitutional violations.  *See George*, 32 F.4th at 1253; *see also Waller*, 932 F.3d at 1285 (explaining that evidence of a pre-existing pattern of violations "is *only* unnecessary" in those rare cases where the unconstitutional consequences of a failure to train are "highly predictable" and "patently

obvious" (emphasis added)).  However, Plaintiffs fail to direct the Court to any specific evidence showing a pattern of similar misconduct (and they do not argue that the multi-day protests are sufficient to create a pattern), so as to demonstrate deliberate indifference on the part of Denver decisionmakers.  *See* [Doc. 197 at 23–25].  The statements in the Stamper report concerning Denver's lack of preparation prior to the protests do not plainly support an inference that any particular policymaker had actual or constructive notice of any training deficiencies, *see* [Doc. 198-49 at ¶¶ 36–37], and Plaintiffs do not explain why or how a reasonable jury could draw such an inference, *see* [Doc. 197 at 24].  *See Connick*, 563 U.S. at 68 ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."); *see also City of Canton*, 489 U.S. at 391 (explaining that a plaintiff must do *more* than "prove that an injury or accident could have been avoided if an officer had had better or more training").  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick*, 563 U.S. at 62.  Moreover, Plaintiffs do not explain why any evidence that Denver "deemphasize[d] training," *see* [Doc. 197 at 24; *see also id.* at 11–12, ¶ 33)], demonstrates Denver's actual or constructive notice of any specific training deficiencies, and given the "stringent" standard of deliberate indifference, the Court cannot find that a reasonable inference of notice can be drawn from this evidence.  *City of Canton*, 489 U.S. at 391.

Finally, even assuming that Plaintiffs' position is that the constitutional violations were plainly obvious—which is not at all clear from Plaintiffs' brief—they have not met their burden because they raise *no* argument that this standard applies or explaining why

this case meets that standard. *See* [Doc. 197 at 24]. This narrow range of cases where this standard is met includes cases where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," *City of Canton*, 489 U.S. at 390, or where the case involves "technical knowledge or ambiguous 'gray areas' in the law that would make it 'highly predictable' that a [person in the officer's] position would need 'additional specified training' to know how to handle the situation correctly," *Waller*, 932 F.3d at 1288 (quoting *Connick*, 563 U.S. at 71). In 2021, the Tenth Circuit adopted the Second Circuit's three-part test for assessing deliberate indifference, which requires the plaintiff to prove that (1) policymakers knew to a moral certainty that their employees would confront a given situation; (2) the situation presents the employee with a difficult choice that training would make less difficult; and (3) the wrong choice would frequently cause the deprivation of a citizen's constitutional rights. *Lance v. Morris*, 985 F.3d 787, 802 (10th Cir. Jan. 19, 2021) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)); *see also Valdez v. Macdonald*, 66 F.4th 796, 817 (10th Cir. 2023) (explaining that the *Lance* court adopted the three-part test). The Court cannot conclude that this is such a case absent any argument from Plaintiffs, as the Court cannot make arguments for Plaintiffs or analyze potential theories on their behalf, especially where a "deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also Brown*, 520 U.S. at 410 (instructing that "'deliberate indifference' is a stringent standard of fault").

For these reasons, Plaintiffs have not demonstrated a genuine dispute of material fact with respect to whether Denver acted with deliberate indifference.  Accordingly, they cannot proceed on this portion of their *Monell* claims.  *See George*, 32 F.4th at 1255 (affirming summary judgment in defendant's favor where the plaintiff "offer[ed] no evidence of a pattern of constitutional violations" and "[did] not argue that proving a pattern of constitutional violations is unnecessary").

In sum, the Motion for Summary Judgment is **GRANTED** to the extent it seeks summary judgment on Plaintiffs' remaining claims to the extent they are based on an informal, widespread custom; a failure to discipline; ratification; or a failure to train.  The Motion for Summary Judgment is **DENIED** to the extent it seeks summary judgment on claims based on an alleged policy of failing to require officers to deploy BWC or failing to require officers to write use-of-force reports.  It is further **DENIED** as to the claims of Plaintiffs Zinman, Cousik, Smedberg, Wood, and Douglas to the extent their claims are based on the decision of Commander Phelan to authorize kettling of protestors on May 31, 2020.  It is **DENIED** to the extent Plaintiff Williams's claims are based on being tear gassed at Colfax and Lincoln on May 28, 2020.  It is **GRANTED** with respect to all other claims based on a final policymaker theory.

## V.    Denver's Liability Based on the Conduct of Aurora Police Officers

Finally, Defendant contends that it cannot be held liable for the actions of Aurora police officers under *Monell*.  [Doc. 175 at 20].  Defendant limits its argument to the claims of Plaintiff McCormick, asserting that Plaintiff McCormick "pursues a claim against Denver premised on the actions of Aurora Officer Joshua Winters."  [*Id.* (citing Doc. 133 at ¶ 369)].  Plaintiffs do not dispute this assertion or argue that Plaintiff McCormick's claims are based

on any actions of Denver police officers.  *See* [Doc. 197 at 25–27].  However, the Court observes that there is at least one assertion in the Third Amended Complaint that could be construed as alleging injuries based on Denver officers' conduct, not the conduct of Officer Winters.  *See* [Doc. 133 at ¶¶ 354, 356–57 (alleging that in the early evening hours of May 30, "DPD officers gassed and shot peaceful protestors with Pepperballs" and that, "[a]fter that," Plaintiff McCormick "was hit with Pepperballs and gassed repeatedly")].  Accordingly, given Defendant's framing of the issue and the uncertainty as to the substance of Plaintiff McCormick's claims, the Court limits its analysis only to the portion of Plaintiff McCormick's remaining claims that are based on the alleged actions of Officer Winters.

Denver makes two assertions:  first, that there is no legal authority establishing that one municipality can be liable under *Monell* for the actions of another municipality's employee, and second, that even if this is a viable legal theory, there is no evidence that any Denver policy, custom, or practice was the moving force behind Officer Winters's actions.  [Doc. 175 at 20].  More specifically, Denver contends that there is no evidence that (1) Commander Phelan specifically directed or authorized Officer Winters's actions; (2) any Denver police officer was directly and personally involved in Officer Winters's deployment of less-lethal munitions; or (3) any Denver official was even aware of Officer Winters's deployment decision.  [*Id.*].

Plaintiffs challenge Denver's first argument, arguing that Denver can be held liable for the actions of Aurora officers.  [Doc. 197 at 25–26].  Plaintiffs, however, do not argue that any particular Denver policy caused Plaintiff McCormick's injuries at the hands of Officer Winters and fail to direct the Court to any evidence demonstrating causation.  *See*

[*id*.].  Instead, they direct the Court to evidence that Aurora officers were acting as agents of Denver during the 2020 protests.  [*Id.* at 26–27].  But Plaintiffs do not explain how a reasonable jury could conclude, based on this evidence, that Denver's alleged policy of not requiring its *own* officers to deploy their BWC or of not requiring its *own* officers to write use-of-force reports during protests—the only two remaining *Monell* theories for Plaintiff McCormick's claims—were the "moving force" behind Plaintiff McCormick's injuries allegedly caused by Officer Winters.  *Schneider*, 717 F.3d at 770.  Indeed, Plaintiffs direct the Court to no evidence that Officer Winters was aware of those purported policies.

Plaintiffs insist that "[i]t is for the jury to decide whether Denver's policies, practices, or customs caused Plaintiffs' constitutional injuries," *see* [Doc. 197 at 27], but this Court must still determine whether Plaintiffs have adduced sufficient evidence to send the question of causation to the jury, *Schneider*, 717 F.3d at 778.  Because Plaintiffs have not done so, summary judgment in Denver's favor on Plaintiff McCormick's claims, insofar as they are based on the conduct of Officer Winters, is appropriate.  Accordingly, the Motion for Summary Judgment is **GRANTED** with respect to the remaining claims of Plaintiff McCormick to the extent those claims are based on the actions of Officer Winters.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendant Denver's Motion for Summary Judgment [Doc. 175] is **GRANTED in part** and **DENIED in part**, as set forth in this Order;

(2)    The Motion is granted with respect to the Fourth Amendment claims of Plaintiffs Allen, Gonzalez, Hedlund, Helmick, Lopez, McCormick, Sanchez,

and Williams, to the extent these claims assert a theory that these Plaintiffs were seized by the use of chemical agents alone, and with respect to the Fourth Amendment claims of Plaintiffs Wood and Douglas to the extent these claims assert a theory that these Plaintiffs were seized by the use of chemical agents alone on May <u>30</u>, 2020;

(3)    The Motion is granted with respect to all Plaintiffs' Fourteenth Amendment claims;

(4)    The Motion is granted as to Plaintiffs' *Monell* claims based on an informal, widespread custom; a failure to discipline; ratification; or a failure to train.  The Motion is granted with respect to Plaintiffs' *Monell* claims based on a final-policymaker theory, except to the extent Plaintiffs Zinman, Cousik, Smedberg, Wood, and Douglas allege that they were subject to kettling on May 31, 2020, or to the extent Plaintiff Williams alleges that he was subject to tear gas at the intersection of Colfax and Lincoln on May 28, 2020.  The Motion is denied with respect to Plaintiffs' First and Fourth Amendment *Monell* claims insofar as they are based on an alleged policy or practice of (1) not requiring officers to deploy their BWC; or (2) not requiring use-of-force reports;

(5)    The Motion is granted as to Plaintiff McCormick's claims to the extent they are based on the alleged actions of Officer Winters;

(6)    On or before **March 6, 2024**, the Plaintiffs and Defendant may each file a Status Report, not to exceed **three pages**, indicating whether their positions on Plaintiffs' Motion to Sever Tyson McCormick's Claims Under Rule 21, and,

in the Alternative, Order Separate Trials Under Rule 42(b) [Doc. 168] have changed after the Court's rulings on the Motions for Summary Judgment.  **The Court will not permit any argument that could have been raised in the original briefing.**  This Court will set this case for a telephonic status conference, for purposes of setting this case for trial, after resolution of the Motion to Sever.

DATED:  March 1, 2024                    BY THE COURT:

Nina Y. Wang
United States District Judge