IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-1213-NYW-KAS

TEJAS COUSIK, *et al.*,

Plaintiffs,

v.

CITY AND COUNTY OF DENVER, *et al.*,

Defendants.

**PLAINTIFFS' MOTION TO PRECLUDE DEFENDANT CITY AND COUNTY OF DENVER FROM RELITIGATING FAILURE TO TRAIN**

## INTRODUCTION

After a three-week trial in March 2022, a jury in *Epps, et al. v. City and County of Denver, et al.*, No. 20-cv-1878-RBJ, rendered a verdict against Defendant City and County of Denver ("Denver") on all of the plaintiffs' *Monell* theories of liability, including failure to train. Ex. 1 (*Epps* Verdict, Dkt. 343, No. 20-cv-1878-RBJ). Final judgment was not entered at the time of the verdict because several other claims remained pending. Over the last two-and-a-half years, the remaining claims in *Epps* were settled and an amended final judgment was entered on August 29, 2024. Ex. 2 (*Epps* Amd. Final Judgment, Dkt. 529, No. 20-cv-1878-RBJ).[1] Now that final judgment has been entered against Denver in *Epps*, Plaintiffs move to bar Denver from relitigating an issue that it fully litigated and lost in *Epps*—whether Denver failed to train its officers in crowd management and use of less-lethal weapons, resulting in violation of protesters' rights during the

---

[1] Final Judgment was entered on August 19, 2024. An Amended Final Judgment was entered in order to clarify the award of costs under 28 U.S.C. § 1920. *Compare* Dkt. 527 (Final Judgment) in No. 20-cv-1878-RBJ *with* Ex. 1.

2020 George Floyd Protests ("GFP"). Because final judgment is an element of issue preclusion, Plaintiffs could not have moved to preclude Denver before the entry of final judgment in *Epps*. Now that final judgment has been entered, Plaintiffs promptly move to preclude Denver from relitigating failure to train in this case, for the reasons discussed below.

### Certificate of Conferral

Pursuant to D.C.COLO.LCiv.R 7.1, Plaintiffs have conferred with Denver about this motion, and Denver opposes it.

### ARGUMENT

**I.      Elements of Issue Preclusion**

"[I]ssue preclusion prevents a party that has lost the battle over an issue in one lawsuit from relitigating the same issue in another lawsuit. Generally speaking, it is not unfair to deny a litigant a second bite at the apple, and preclusion conserves resources and provides consistency in judicial decisions." *In re Corey*, 583 F.3d 1249, 1251 (10th Cir. 2009). Federal law applies to the preclusive effect of a federal-court judgment. *Id.* "Under federal law, issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." *Id.* (quoting *Arizona v. California*, 530 U.S. 392, 414 (2000) (cleaned up)); *see also Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation*, 975 F.2d 683, 687 (10th Cir. 1992). Issue preclusion (also known as collateral estoppel) will bar a claim if the following elements are met:

> (1) The issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

1

*Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995). Here, there can be no dispute that elements 3 and 4 are met. The party against whom the doctrine is invoked—Denver—was a party in *Epps*, and Denver had a full and fair opportunity to litigate the issue (failure to train officers on less-lethal weapons and crowd management) at a jury trial in that case.

Nor can there be a dispute that element 2—final adjudication on the merits—has been met. Final judgment has been entered on the jury verdict in *Epps* (*see* Ex. 1), and the finality of the judgment for preclusion purposes is unaffected by the fact that Denver has appealed the judgment.[2] *Id.* at 979 (judgment entered after a jury verdict is full adjudication on the merits). "The pendency of the appeal does not alter the finality of the case for purposes of res judicata or collateral estoppel." *Bui v. IBP, Inc.*, 205 F. Supp. 2d 1181, 1189 (D. Kan. 2002) (citing Wright, Miller, *Fed. Prac. & Proc.* § 4433 (1981) (noting established rule in federal courts is that a final judgment retains all of its res judicata consequences pending decision of the appeal)); *Coleman v. Tollefson*, 575 U.S. 532 (2015) ("a judgment's preclusive effect is generally immediate, notwithstanding any appeal."); *Clay v. United States*, 537 U.S. 522, 527 (2003) ("Typically, a federal judgment because final for appellate review and claim preclusion purposes when the district court disassociates itself from the case, leaving nothing to be done at the court of first instance save execution of judgment."); *Roberts v. Anderson*, 66 F.2d 874, 875 (10th Cir. 1933) (final judgment is conclusive for preclusion purposes unless and until it is set aside on appeal); *accord Coleman v. D.R. Horton, Inc.*, 505 F.3d 874, 882 (9th Cir. 2007); *Virnich v. Vorwald*, 664 F.3d 206, 216 n.4 (7th Cir. 2011); *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994); *Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212, 1215 n.1 (6th Cir. 1989); *Jaffree v. Wallace*, 837 F.2d 1461, 1466-67 (11th Cir. 1988); *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed. Cir. 1983).

---

[2] Denver filed a notice of appeal on September 16, 2024. Dkt. 531, No. 20-cv-1878-RBJ.

Only element 1—whether the issue previously decided in *Epps* is identical with the one at issue in this case—requires any discussion. But an examination of the *Epps* verdict and jury instructions, as well as the evidence presented at trial, shows that, in finding Denver liable for violation of plaintiffs' First and Fourth Amendment rights on the failure to train, the jury necessarily decided that Denver failed to train its officers in crowd management and use of less-lethal weapons—which is identical to the issue in this case.

## II. The *Epps* Jury Necessarily Decided the Identical Issue of Failure to Train on Use of Less-Lethal Weapons and Crowd Management

To start, Plaintiffs in this case allege that Denver failed to adequately train its officers in crowd management tactics and use of less-lethal weapons, that Denver was deliberately indifferent to its failure to train, and that this failure caused the violations of their First and Fourth Amendment rights at the GFP. Dkt. 133 (Third Amd. Compl.) ¶¶ 417-21, 423-25, 436, 498-506, 508, 512-14, 516; *see also* Dkt. 226 (Mot. for Reconsideration) at 13-17 (describing evidence of failure to train on less-lethal weapons and crowd management presented at summary judgment). The less-lethal weapons used by Denver at the GFP against Plaintiffs included PepperBall guns, 40 mm launchers, CS gas and pepper spray, and less-lethal explosives such as flashbang grenades. *See* Dkt. 226 at 2-6; Dkt. 197 (Resp. to SJ) ASDF ¶¶ 4-7, 9, 12-15, 18-19, 20-21, 22, 24-30. The question is whether the *Epps* jury's verdict against Denver on failure to train necessarily decided the identical issue: namely, whether Denver had insufficient training that related to the alleged constitutional violations of plaintiffs, and whether Denver's failure to train was deliberately indifferent.

*Epps* was a consolidated case with twelve plaintiffs who tried their claims against Denver. Like the Plaintiffs in this case, the *Epps* plaintiffs suffered injuries from different less-lethal weapons used by Denver police during the first five days of the protest. *See* Ex. 3 (*Fitouri* Third Amd. Compl., Dkt. 219, No. 20-cv-1878-RBJ); Ex. 4 (*Epps* First Amd. Compl., Dkt. 178, No. 20-

3

cv-1878-RBJ). Specifically, the *Epps* plaintiffs alleged Denver failed to train its officers on less-lethal weapons use during protests and crowd management. *See* Ex. 3 ¶¶ 374, 375-77, 381, 391, 438, 447. Plaintiffs in this case allege the same thing. *See* Dkt. 133 ¶¶ 417-21, 423-25, 436, 498-506, 508, 512-14, 516.

At trial, the *Epps* jury was instructed that plaintiffs alleged that Denver inadequately trained its employees in a way that deprived the plaintiffs of their constitutional rights. Ex. 5 (*Epps* Jury Instructions, Dkt. 340, No. 20-cv-1878) at 18.[3] The *Epps* jury was instructed in Jury Instruction No. 16 that plaintiffs alleged that their constitutional rights were violated as a result of "Denver's failure to train its officers and that this alleged failure can be considered the official policy of Denver." *Id.* at 21. In order to prevail on this claim, the plaintiffs had to prove four elements: 1) that an act of one or more officers violated their constitutional rights (under the First and/or Fourth Amendments); 2) that "Denver had insufficient training or supervision that relate to the alleged constitutional violations of plaintiffs," and that plaintiffs had to "identify specific deficiencies in Denver's training or supervision that relate to the alleged constitutional violations of plaintiffs"; 3) that the "deficient training or supervision caused the deprivation of the plaintiff's rights; that is, the City's deficient training or supervision is closely related to the deprivation of the plaintiff's rights so as to be the moving force that caused the ultimate injury"; and 4) "Denver adopted its policy of deficient training with deliberate indifference." *Id.* The jury was instructed on the definition of deliberate indifference. *Id.* After a three-week trial, during which twelve plaintiffs, two experts, and numerous Denver Police Department ("DPD") witnesses testified, the jury found that Denver was liable for violating the First and Fourth Amendment rights of eleven plaintiffs due

---

[3] Page citations refer to the original pagination at the bottom of the page.

to its failure to train its officers. Ex. 1 (Verdict).[4] Specifically, the verdict form asked as to each plaintiff, "Is Denver liable for violating [named plaintiff]'s First or Fourth Amendment rights under any of the following theories as explained in Jury Instructions 15, 16, and 17?" *Id.* at 1-7, 9. The jury affirmatively checked the boxes for failure to train in favor of the plaintiffs. *Id.*

An examination of the evidence presented at the *Epps* trial helps show what the jury necessarily decided in its verdict against Denver on plaintiffs' failure to train theory. "Adjudication on the merits requires that the adjudication be necessary to the judgment." *Murdock*, 975 F.2d at 687. "*Necessary* inferences from the judgment, pleadings, and evidence will be given preclusive effect … the inquiry is whether rational jurors must necessarily have determined the issue as to which estoppel is sought." *Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994). First, in finding against Denver on the failure to train, the jury necessarily determined that each of the four elements of failure to train had been met—including that Denver had deficient training that related to the constitutional violations and that Denver was deliberately indifferent. *See* Ex. 5 at 21; Ex. 1 at 1-7, 9. Second, as to what the "specific deficiencies" were in Denver's training, Plaintiffs presented evidence to the jury that Denver failed to train its officers on how to use less-lethal weapons and crowd management tactics. These issues related directly to the violation of plaintiffs' First and Fourth Amendment rights during the GFP.

The *Epps* plaintiffs presented testimony from their experts, Norman Stamper and Edward Maguire, on the specific deficiencies in Denver's training on use of less-lethal weapons and crowd management, how these deficiencies led to the constitutional violations against plaintiffs, and Denver's deliberate indifference. They also presented corroborating testimony on these topics

---

[4] As to one of the plaintiffs, Ashlee Wedgeworth, the jury found that Denver's failure to train caused the violation of her First Amendment rights but found in favor of Denver on the Fourth Amendment claim. Ex. 1 at 6.

from Nicholas Mitchell, the former Independent Monitor, DPD's Rule 30(b)(6) witnesses on training, Erik Knutson and Ryan Grothe, and DPD Incident Commander Patrick Phelan. Their testimony is summarized below.

**Norman Stamper** testified that Denver's training of the officers involved in the GFP was "woefully inadequate" and allowed officers to use methods that no other police department would permit. Ex. 6 (*Epps* Trial Tr.) at 404. Lack of training and education was one of the "root causes" of officers' improper conduct and use of force during the GFP. *Id.* at 405-06; *see also id.* at 529. Denver failed to train and prepare officers for how to handle demonstrations, as shown by the improper behavior of officers during the GFP. *Id.* at 560, 562-65. Video from the GFP showed that Denver officers were improperly trained. *Id.* at 551. Denver inadequately trained officers on the use of chemical munitions, including tear gas, PepperBalls and pepper spray. *Id.* at 633. Denver provided no training to officers in the use of flashbang explosive devices, which inevitably resulted in the problematic ways DPD used those devices during the GFP. *Id.* at 659-62. Officers who were properly trained would know that less-lethal explosive devices should not be used against demonstrators. *Id.* at 462-63. Properly trained officers would not have shot PepperBalls directly at individuals, as Denver officers did. *Id.* at 541-42.

**Edward Maguire** testified that DPD's training on crowd management was deficient and outdated. *Id.* at 2004, 2011-13, 2087. DPD did not train its officers on its policies in the Crowd Management Manual, which was the manual that was supposed to guide officers on use of less-lethal weapons during a protest. *Id.* at 2113-14. In fact, DPD had been routinely failing to train its officers for several years before the protests on how to use appropriate force during protests. *Id.* at 2044. DPD failed to train on the use of dangerous munitions, such as flashbang and Stinger grenades, which was dangerous. *Id.* at 2026-27, 2029. DPD training materials on less-lethal

6

weapons contained misleading and inaccurate information about how to use the weapons. *Id.* at 2030-33. Maguire testified that when police used indiscriminate force on crowds (as the DPD did during the GFP), it tends to escalate violence. *Id.* at 2018-19. DPD inadequately trained officers on crowd management skills, such as how to communicate with protesters or crowds. *Id.* at 2021-23, 2006-10. Maguire testified that, according to Lt. John Coppedge, DPD's training academy lieutenant, trainings did not receive organizational support and the prevailing attitude under the chief of police was that training was not important. *Id.* at 2005-06. This was problematic because officers need to be trained on perishable skills, skills that degenerate over time and therefore require consistent training, such as crowd control. *Id.* at 2005-06. DPD's repeated failure to train its officers presented an obvious potential for excessive use of force and violation of First Amendment rights of protesters. *Id.* at 2044.

**Nicholas Mitchell**, the former Independent Monitor, testified about the work his office did to assess DPD's response to the GFP. *Id.* at 1705, 1708, 1710. During the course of his investigation, Mitchell interviewed DPD Lt. Coppedge. *Id.* at 1720-21, 1723-25. When discussing with Coppedge what kind of training Denver officers had received to prepare them for mass protests, Coppedge described a DPD leadership failure. *Id.* at 1724-25. Coppedge told OIM there was a change in attitude regarding training from the prior DPD leadership to the one in place during the GFP, and that it was difficult to get officers to attend training on crowd control and crowd management in recent years. *Id.* at 1725-26. Crowd control skills are perishable. *Id.* at 1726. Coppedge characterized the current chief of police's attitude towards training as not important. *Id.* at 1727. Denver officers told the OIM that they felt a need for more training. *Id.* at 1726-27. Mitchell testified that without an emphasis in training from the top (i.e., DPD leaders), officers

7

would not attend training on perishable skills like field force and crowd management and control. *Id.* at 1727-28.

Mitchell also interviewed DPD Captain Sylvia Sich, who described officer actions during the GFP as reflective of a lack of training and supervision. *Id.* at 1731-34. Erik Knutson, DPD's primary crowd control trainer, informed Mitchell that he had developed a three-day field force operations class in 2015 but that in 2016, DPD commanders stopped sending officers to that training, which resulted in the end of that class. *Id.* at 1737-39, 2413-15. Knutson informed Mitchell that after watching video of the GFP, officers were relying too heavily on use of PepperBalls. *Id.* at 1739, 2422. Mitchell testified that Lieutenant Kim Lovato told him that DPD was not prepared for the protests, and they were "caught with their pants down," resulting in "chaos." *Id.* at 1739-40. When OIM asked Deputy Chief Barbara Archer how the department could ensure that PepperBalls hit their intended target, she simply said, "training." *Id.* at 1741. DPD officers told OIM that they had not received crowd control or field force training for several years before the GFP. *Id.* at 1749. Mitchell also testified that after the 2011 Occupy Denver protests, the OIM encouraged DPD to reassess its policies and training on the use of less-lethal weapons (including OC spray and PepperBalls) in responding to those protests, but DPD declined to do so, which was a "missed opportunity." *Id.* at 1710, 1815-20. Thus, years prior to the GFP, Denver had notice of deficiencies in its training which would lead to constitutional violations and failed to take the opportunity to do anything about it.

**Erik Knutson**, a DPD sergeant who provided training in the DPD, confirmed that DPD did not train its officers on the guidelines in the Crowd Management Manual. *Id.* at 2411-12. Nor did DPD train officers in how to use less-lethal grenades. *Id.*

8

**Ryan Grothe**, a DPD witness on use of force training, testified that DPD did not train its officers on the use of flashbang or Stinger grenades for crowd control. *Id.* at 2543.

**DPD Incident Commander Patrick Phelan** made final decisions on the police response to the protest. *Id.* at 1186. He agreed that field force training involves perishable skills, and that if officers are not provided training in field force tactics and crowd management, those skills may perish. *Id.* at 1188. During the GFP, DPD used chemical weapons such as CS gas, PepperBalls and flashbang grenades to move protesters. *Id.* at 1205. Phelan thought that officers in the DPD acted within policy and training during the protests. *Id.* at 1224. He did not see any officers use force inconsistent with their training (or policy). *Id.* at 1224-25.[5]

The *Epps* plaintiffs testified about how their First and Fourth Amendment rights were violated by DPD's use of specific less-lethal weapons—PepperBall guns, OC spray, CS gas, and less-lethal explosive devices such as flashbang grenades—the same weapons used on the Plaintiffs in this case (and in most of the instances, during the same dates, times, and locations at the GFP). Their testimony is summarized below:

**Plaintiff Claire Sannier** inhaled chemicals[6] when the Denver police shot PepperBalls at her and the crowd at the Highland Bridge on May 28, 2020. *Id.* at 80, 82, 85, 88-93. While she protested peacefully at Colfax and Washington later that evening, Denver police gassed her. *Id.* at 94, 97-100. On May 29, 2020, Denver police gassed her again while she protested peacefully, *id.* at 101-05; a Denver police officer shot her with a PepperBall while filming the police later that evening, *id.* at 106-09. On May 30, 2020, on 16th Street, Denver police shot at her and a peaceful

---

[5] In addition, Denver permitted their officers, including Keith Valentine and Jonathan Christian, to throw less-lethal grenades at the protest despite receiving no training on grenades. *Id.* at 1070-71, 1107-08, 1462-63.

[6] All of the plaintiffs testified to the adverse physical effects of the chemicals.

9

crowd with PepperBalls, *Id.* at 112-17. While she peacefully demonstrated, Denver police gassed her and the crowd repeatedly around 7:00 p.m. on May 30, 2020, at the intersection of Lincoln and Colfax. *Id.* at 120-27. Denver police also threw less-lethal explosives at her during this time, and a flashbang grenade exploded next to her foot, *id.* at 133-34, 137-38; later that evening, police chased her and shot her with PepperBall guns, *id.* at 135-36. On May 31, 2020, while marching on Colfax at 9:37 p.m., Denver police kettled her at Colfax and Pennsylvania near a basilica and unleashed massive amounts of tear gas, *id.* at 140-46; *see also id.* at 1397-99, 1406. On June 1, 2020, after midnight, Denver police unleashed gas and flashbang grenades on her and other peaceful protesters at the Capitol. *Id.* at 147-51. Denver police shot her dozens of times with PepperBalls during the course of her curfew arrest on June 1. *Id.* at 152-53.

**Plaintiff Stanford Smith** was shot with PepperBalls and gassed by Denver police on May 30, 2020, *id.* at 211-12, 216-17; he was also pepper sprayed in the face at 7:34 p.m. near the intersection of Lincoln and Colfax while peacefully protesting, *id.* at 220, 224-27.

**Plaintiff Zach Packard** attended the protests on two days, including May 30, 2020. *Id.* at 255. While peacefully protesting on May 30 around 7:00 p.m. near the Capitol, Denver police gassed the crowd and indiscriminately shot at him and other protesters with PepperBall guns. *Id.* at 257-61.

**Plaintiff Sara Fitouri** attended two weeks of the protest. *Id.* at 672. On May 28, 2020, Denver police shot PepperBalls at her and a peaceful crowd while on the Highland Bridge. *Id.* at 672, 674-77. On May 29, she was gassed by Denver police while protesting at the Capitol. *Id.* at 679-81, 686-88. On May 30, while protesting peacefully at Lincoln and Colfax, Denver police gassed her and threw a flashbang grenade at her, which exploded on her foot. *Id.* at 689-95. Later that evening, as she marched with other protesters, police shot her with PepperBalls while

10

"hunting" her and her friends in alleyways. *Id.* at 697-99. On May 31, she was gassed and shot at with PepperBalls when the police broke up a peaceful march down Colfax with tear gas. *Id.* at 704, 706-10. Later that evening, she was kettled and gassed at the basilica on Colfax and Pennsylvania between 9:37-9:43 p.m. *Id.* at 710-14.

**Plaintiff Jacquelyn Parkins** attended the protests for two weeks, with Fitouri. *Id.* at 1664. She was present for all of the events Fitouri testified to. *Id.* at 1666. She was subjected to chemical agents from gas and PepperBalls unleashed by Denver police. *Id.* at 1666-67, 1673-76, 1682-86.

**Plaintiffs Maya Rothlein** and **Amanda Blasingame** attended the protest on May 28, 2020. *Id.* at 754. At Colfax and Washington, Denver police used chemical weapons, including gas, on them. *Id.* at 754, 756-59, 809-10. Later that evening, Denver police gassed them at 14th and Sherman while they were protesting. *Id.* at 760-63, 811-12. On May 30, Denver police threatened them while they were on their own property and shot PepperBalls at them. *Id.* at 768-78, 836-37. Denver police also used gas and PepperBalls on Blasingame on May 30 at the Civic Center bus station by the Capitol. *Id.* at 818-22.

**Plaintiff Joe Deras** attended four days of the protest. *Id.* at 990. On May 28, he, along with Fitouri and Parkins, suffered from chemical agents from Denver's PepperBalls while on the Highland Bridge. *Id.* at 994-99. On May 30, Denver police gassed and shot him with PepperBalls at Lincoln and Colfax. *Id.* at 997-1001. Police threw a flashbang grenade at him, which exploded near him. *Id.* at 998. He (and Fitouri and Parkins) were chased through alleyways by Denver police on the evening of May 30 and gassed. *Id.* at 1002-04. On May 31, he was gassed at the intersection of Colfax and Washington while marching peacefully down Colfax. *Id.* at 1006-07.

**Plaintiff Elisabeth Epps** was shot in the leg with PepperBall for jaywalking during the protest by DPD Officer Christian, who testified that this use of force was consistent with his

11

training. *Id.* at 1483-84, 1850. Christian's use of PepperBalls during the GFP was consistent with DPD training. *Id.* at 1532. She was also gassed at 14th and Sherman on May 28, 2020, while peacefully protesting. *Id.* at 1836-43. Denver police subjected her to more chemical munitions that evening at 14th and Lincoln. *Id.* at 1846-48. On May 29, she was shot in the back with impact munitions, while she was filming the police. *Id.* at 1852, 1855, 1857, 1865-66. On May 30, she was shot with PepperBalls and gassed by Denver police while protesting and filming the police at the intersection of Lincoln and Colfax between 7:00-8:00 p.m. *Id.* at 1876, 1878, 1880-83.

**Plaintiff Kelsey Taylor** inhaled chemicals from PepperBalls shot by Denver police at the Highland Bridge on May 28, 2020, while she was protesting. *Id.* at 1545-46. Later that evening, she was at 14th and Sherman peacefully protesting with her friend Breezy (Brianne) Sanchez when Denver police gassed her and the rest of the crowd. *Id.* at 1553-57. On May 30, she was peacefully protesting at the intersection of Lincoln and Colfax between 6:00-8:00 p.m. when Denver police gassed and shot into the crowd. *Id.* at 1558-61. She was gassed and shot with PepperBalls. *Id.* at 1562-63.

**Plaintiff Hollis Lyman** attended the protests on May 28, 2020 and was gassed near the Capitol. *Id.* at 1933-34. On May 29, police pepper sprayed her while she was kneeling and holding a sign. *Id.* at 1937-40. Later, as she stood on a sidewalk and held up her Black Lives Matter sign, the police shot her and her sign with PepperBalls. *Id.* at 1942-44. On May 30, she attended the protest at Lincoln and Colfax close to 8:00 p.m. *Id.* at 1950. Denver police fired tear gas, PepperBalls, and flashbangs at the crowd. *Id.* at 1954-55. A less-lethal explosive was thrown and exploded over her head. *Id.* at 1955.

In closing argument, the *Epps* plaintiffs argued that Denver failed to train its officers on how to use less-lethal weapons (including explosives such as flashbang grenades) during protests

and failed to train its officers on crowd management and crowd control, which led to the First and Fourth Amendment violations against the plaintiffs. *Id.* at 2960-69. They argued that the evidence showed that Denver's failure to train was committed with deliberate indifference because protests were recurring situations presenting an obvious potential to result in constitutional violations. *Id.* at 2963. The jury agreed and found for plaintiffs and against Denver on the failure to train. Ex. 1.

In finding that Denver violated the First and Fourth Amendment rights of the plaintiffs due to its failure to train, the *Epps* jury necessarily found that Denver had failed to adequately train officers on the use of less-lethal weapons and crowd management. These were the "specific deficiencies in Denver's training" that the plaintiffs had identified during trial and argued were "relat[ed] to [their] alleged constitutional violations," Ex. 5 at 21. The adjudication of these issues was necessary to the judgment against Denver. *See Murdock*, 975 F.2d 683, 687-88 (finding the issue previously litigated was identical after analyzing the evidence and prior holding); *Frandsen*, 46 F.3d at 979 (finding that identical issue was previously litigated). Moreover, in finding for plaintiffs on the failure to train, the *Epps* jury necessarily found that "Denver adopted its policy of deficient training with deliberate indifference." Ex. 5 at 21. Thus, the identical issue was necessarily adjudicated on the merits against Denver.

Given that all of the elements of issue preclusion are met, Denver should be precluded from relitigating the failure to train theory of municipal liability in this case.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court apply issue preclusion to bar Denver from relitigating its failure to train officers on the use of less-lethal weapons and crowd management and its deliberate indifference.

Respectfully submitted,

s/ Elizabeth Wang
Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*Counsel for Plaintiffs*

Lauren Carbajal
Jordan Poole
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
carbajal@loevy.com
poole@loevy.com

## Certificate of Service

    I, Elizabeth Wang, an attorney, hereby certify that on September 20, 2024, I served the foregoing motion via CM/ECF on counsel of record for all parties.

s/ Elizabeth Wang
Counsel for Plaintiffs

14